**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ZHAOJIN DAVID KE,** | ) | |
| | ) | **Civil Action No. 08-268E** |
| **Plaintiff,** | ) | |
| | ) | |
| **V.** | ) | |
| | ) | **Judge Sean J. McLaughlin** |
| **EDINBORO UNIVERSITY OF** | ) | |
| **PENNSYLVANIA, FRANK POGUE,** | ) | |
| **JANET DEAN, TERRY SMITH,** | ) | |
| **RIVA SHARPLES,** | ) | |
| | ) | |
| **Defendants.** | ) | **Electronically filed.** |

**MOTION FOR RETRIAL**

**NOW COMES** Plaintiff Zhaojin David Ke to respectfully move this honorable court for leave

for a retrial. Although he requested his attorneys to implement the same, they notified Plaintiff

on the afternoon of September 23, 2011 that the judge had granted them leave to withdraw their

representation.

Still seeking justice, Plaintiff is making this request for a retrial of all issues under FRCP

59, and he herein states his reasons as follows:

1.        Plaintiff's counsel used adequate evidence during the trial to prove the charges of

discrimination and, in particular, retaliation in accordance with the rules of law laid out in the

jury instructions.

2.        The discrimination hinged on continuous disparate treatment in course assignment

and especially in Defendants' use of different and higher standards during his tenure application

process for retaliation purposes.

1

3.      The retaliation was shown in Pogue's deliberate indifference to and his ignoring of Plaintiff's many letters of complaints addressed to him and in his predicating his tenure decision on negative tenure recommendations without investigating Plaintiff's complaints about racial discrimination and retaliation. Pogue admitted that at the trial and, earlier, in his deposition (Exhibit 1).

4.      Plaintiff's attorney also proved Sharples' and Smith's discrimination and retaliation at the trial.

5.      Another factor motivating Pogue, Dean, and Smith to retaliate against Ke was his complaint to EEOC on October 19, 2006. Defendants claim Plaintiff complained to EEOC on January 11, 2007, but that was contradicted by the activity log that showed EEOC people in Pittsburgh had looked at the complaint on December 6, 2006 (Exhibit 2). In fact, the very day Plaintiff complained to EEOC by filling Form 283 (Exhibit 3), that was his protected filing date.[1] Plaintiff filed his second Form 283 about retaliation on or about Nov. 5, 2006. (Exhibit 5).

6.      The correct filing dates would have informed the jury that Pogue and Dean had had the motive to retaliate against Ke also because of his complaints made to the EEOC. It was not merely due to his complaints about Sharples.

7.      Plaintiff's case is supported by overwhelming evidence, statutes, and case law.

---

[1] Plaintiff first filed Form 283 (Intake Questionnaire) with EEOC's Pittsburgh Area Office on October 19, 2006. According to *Federal Express Corporation v. Holowecki*, 552 U.S.__ (2008), as soon as an EEOC intake questionnaire was filed, the charge date was established. Before the Supreme Court made that ruling, EEOC had already issued the memo in 2007 to let its field offices "docket the questionnaire…and serve **notice** on the respondent within ten days of receipt." (Exhibit 4). That meant EUP received the first notice (not the official charge) on or about October 30, 2006. (42 U.S.C. § 2000e-5 (b).) EEOC's retaliation charge against EUP in terms of a timeline started from that date.

8.      It has been meritorious over the past four years, endorsed by EEOC in its three determinations, and it survived the defendants' summary judgment motion last year despite defense counsel's fabricated "evidence."

9.      So the jury's hasty verdict was prejudicial and manifestly unfair, amounting to abusing their discretionary power.

10.     The verdict they came up with was due to a number of defects on their part. To begin with, the jury never followed the instructions, in which, for example, the court clearly laid down the rules of law regarding discrimination and retaliation under Sec. 1983 and Title VII. The court emphasized "race" as **a factor**, not as the reason itself.

11.     It was the defense counsel who kept replacing the word "factor" with the word "Chinese."  He kept asking the jury if Ke was denied tenure **just because he was Chinese**. To ask if Ke was denied tenure because of a race factor is drastically different from the question if Ke was denied tenure **because he was Chinese**. The latter was intentional misinterpretation and meant to mislead the jury to make them reach erroneous decisions.  That was clearly misrepresentation and misconduct on the part of the defendants.

12.     Plaintiff's attorney, Mr. Hunter, kept emphasizing that Ke was denied tenure because of discrimination in terms of the defendants using different and higher standards, supporting his argument with ample documented evidence, and he also vehemently argued that the different and higher standards were used for retaliation purposes. He proved that retaliation from Sharples and Smith was caused by Plaintiff conducting protected activities (the 5/11/06 and 7/15/06 emails among others) under both Sec. 1983 and Title VII.

13.     The legal guidelines applicable to Ke's charges were clearly laid out in the jury instructions, but the jury chose to ignore them.

14.     The jury really did not understand the instructions. The court read it aloud for almost an hour, and the instructions contained many legal terms. Since none of the jurors had a college degree, they would have trouble understanding the instructions through mere listening and would tend to cause miscarriage of justice.

15.     The jury's deliberation also showed irresponsibility. The court was adjourned at 12:30 on Sept. 13, 2011. The jurors went to the jury room to have lunch provided by the court before they started their deliberations. The jury instructions alone would have taken them more than thirty minutes to just read through, and there were many legal terms. The jurors were provided with 123 exhibits, and perusing even a dozen of them would take an hour or so.

16.     However, they reached the unanimous decisions very quickly in contradistinction to the instruction that "[their] verdict should be reached only after careful and thorough deliberations," as stipulated in the jury instructions, and Ke was in the middle of having his lunch when Attorney Timothy McNair called and said the jury had reached a verdict. It was only 1:49 in the afternoon.  Their hasty decision prejudiced Ke.

17.     Given the merits of his complaint, Plaintiff was not supposed to lose his case. In fact, defense counsel even made another offer for settlement during the trial.

18.     The trial itself was contaminated by accumulative false testimonies introduced by the defendants that negatively affected the jury. Taking advantage of their administrative power, Defendants mobilized **nine** of Plaintiff's former colleagues, members of the inner circle and those who signed the pledge of support letter for Donald Sheehy in September 2003, to come to court to offer "direct" evidence.  They had a common interest in the outcome of the case, which was to keep Plaintiff from being reinstated. Two of the witnesses, Mary Carden and William Hunter, did not even have the chance to testify because they came too late.

19.     Each of the seven, after flaunting his or her self-inflated curriculum vitae (irrelevant to the case at trial) before lying about Plaintiff's scholarship and service. They had been coached to do that, as the falsehoods they presented had already been repeated continuously over the past three years in defense counsel's court filings. By way of example, and not of limitations, their false testimonies are shown as follows:

a.      John Repp accused Plaintiff of not willing to make a distinction between traditional publishing and vanity publishing, but, when cross-examined, he acknowledged that he himself used POD technology to publish his chapbooks (each is like a chapter, about 25 pages long, hence the chapbook) with March Street Press, which was an out-and-out vanity press because it charged a reading fee and urged its authors to write positive comments on Amazon.com by using different names. Repp read that message aloud in court (Exhibit 6).

b.      Next Lipinski lied about Ke's scholarship, as he did in his verification (Exhibit 7),[2] even accusing him of selling his textbook to his students, but while he admitted he had never published **anything** during his probationary years and still received tenure he was confronted with evidence that he himself sold his first novel **directly** to his students and that the practice is still being carried out by ETA faculty members (Exhibit 8).

_____

[2] Lipinski fabricates information. Even in his verification (Exhibit 7), undated and unsigned and really written by defense counsel to support her summary judgment motion in July 2010, he lied numerous times. He started by writing, under oath, "Thomas Lipinski, verify that the following information is true and correct to the best of my personal knowledge or information and belief: 1. I am presently employed by Edinboro University of Pennsylvania **as a Full Professor** in the English and Theater Arts (ETA) department…" Even today he is not a full professor. He also lied about presenting an academic paper in Toronto in 2004 (Exhibit 11) whereas he went there to visit his brother and his family living on St. Lawrence Ave. He lied to get department travel fund.

c.        Elizabeth Joyce then took the stand. She lied about her service in her

tenure application. For example, she was teaching English in Poland from fall 2006

through spring 2007, but she claimed she was on the elections committee during that

period of time (Exhibit 9). She lied that she had no knowledge of Plaintiff serving on the

elections committee, but she welcomed Ke to the elections committee in May 2006 and

Sharples once emailed both her and David Ke in July 2006 to run votes (Exhibit 10).

d.        Joyce was tactful and only said she had "no knowledge" instead of

denying that Ke ever served on the committee. By contrast, Robert Hass, Sheehy's

former student, "testified" that he only saw Ke on the elections committee once. He never

specified which year he was talking about. In fact, according to ETA's governance book,

Ke served on the committee with him in 2003 and in 2004 Ke continued to serve but

Hass was gone (Exhibit 12). It was Hass who was often not available for counting votes.

e.        Then Catherine Whitley testified that she had seen Ke at the university

library information services committee meeting only once. The truth was that sometimes

Plaintiff was there and did not see her present.

f.        Jeffery Bartone and John Cussen also testified, both lying that Ke was

elected to the composition committee and attended only its first meeting.  They lifted this

information from Donald Sheehy's secret letter sent to Smith in January 2005 (Exhibit

13). In doing so, they joined the conspiracy against Ke initiated by Smith, Sheehy, and

Sharples. Ke was never elected to the composition committee, and to make his claim

sound real Bartone lied that it was he who had nominated Ke, but Ke explained at the

trial that if he had been nominated against his wishes, he could simply have crossed out

his name on the candidacy list to make sure he was not elected to that committee, as can be proved by Lisa Joyce's email (Exhibit 14).

g.       The fact that both Bartone and Cussen lied on the stand can also be proved by the accompanying exhibit, which shows both their names but not Ke's (Exhibit 15). The exhibit also shows that since the list was for "staggered 2-year terms," in the fall of 2004, in reference to Exhibit 13, Cussen was on the committee (his term would end by 2006) but Bartone was not even on the committee. Bartone lied he had nominated Ke as though if a colleague nominated another colleague this second colleague would automatically get on the committee without competition.

h.       Bartone was then cross-examined on his scholarship. He admitted he had published absolutely nothing during his five probationary years (only an excerpt of his only previously published novel *Marude X* in *Erie Times News*). Even that novel according to Sharples' dissertation (Exhibit 16), had been published through POD technology, which was what Defendants kept accusing Plaintiff of.

20.       These instances have not been cited to prove or not to approve scholarship or service, but to demonstrate that the seven witnesses all lied on the stand "with a design or intent to deceive," and their lies, in sum total, perfectly match what Defendants alleged in their summary judgment motion and what UWTC's false tenure recommendation stated, leading to the inference that the witnesses had all been coached to lie. Such testimonies contaminated the trial and infected the jury because they were deemed "direct" evidence according to the jury instructions.

21.       Such organized false testimonies—under oath—also show that Defendants never took the court and law seriously. Their tradition in lying to court without ever getting sanctioned

has been carrying on over the past three years, culminating in the trial where Defendants, through perjury and a show of contempt for court, won the day.

22.     Defendants' organized false testimonies considerably prejudiced Plaintiff because according to the jury instructions if they lied they lacked credibility and then their lies should never have been used by the jury to base its verdict on.

23.     Indeed, if the jury had known that the seven witnesses had all falsely testified, the jurors, regardless of their background, would have ruled differently. The defendants all falsified while smiling at the jury. Sharples started by lying that she had taught at the Univ. of South Dakota for two years before she resigned in May 2009 to become the editor-in-chief for *Tri-County News*[3]. That was to be consistent with the same lie she had made in her deposition, but in realty she worked at the Univ. of South Dakota for only one academic year before "she was let go"— to quote her chair Dr. Lubbers—in May 2008.

24.     On the witness stand, she amazingly admitted kicking Plaintiff out of his office— Room 223—in May 2006 after he had changed the asbestos tiles on his office floor to vinyl tiles, but she denied moving in herself. Instead, she lied that she gave the room to Paul Rovang because he was allergic to carpet. (Was that itself discrimination under Title VII?) The truth was that in the fall semester of 2006 the facilities department finally replaced the asbestos tiles in all ETA offices with carpet. Because Paul Rovang claimed he was allergic to carpet he moved in with Sharples (who was seldom seen in her office anyway) at the end of 2006 (Exhibit 17).

25.     She even lied about the title of her PhD dissertation in both her summary judgment motion and her deposition in order to pass off as an expert on book publishing. She

---

[3] *Tri-County News* is a newspaper in Irene, South Dakota, USA covering local news, sports, business, jobs, and community events. The newspaper is published once a week on Thursday. Circulation: 524 copies. See http://www.mondotimes.com/1/world/us/41/8793/24771.

said the title of her PhD dissertation was "Popular Literacy, How Book Sellers Market Their

Books" (Exhibit 18) (this title is a paradox because the first concept is about literacy while the

second is about **selling** books), whereas the actual title is "The Business of Consumer Literacy:

How the Modern Book Industry Shapes What We Read" (Exhibit 19).

26.     In fact, even in her negative tenure recommendation, deposition, undated

description of her meeting with Plaintiff on April 18, 2006 (which has two anachronisms), and

her testimony on the stand, she lied dozens of times. Plaintiff's counsel already exposed a

number of her falsehoods, but the jury did not use that against her.

27.     Plaintiff's attorney proved retaliation at trial according to the rules of law in the

jury instructions. He successfully predicated it on two factors: (1) retaliation under USC-

2000e(a) that is based on initially making a complaint about discrimination and  (2) retaliation

based on race as a factor in the context of plaintiff being treated with different and higher

standards. Both factors were explained in the jury instructions, but the jury chose to ignore them.

28.     For the aforementioned reasons, Plaintiff believes he well deserves a new trial

under FRCP 59. In his current circumstances, he requires six months to prepare for the new trial

as he needs to contact and retain new counsel in Philadelphia.

29.     Additionally, given the civil rights environment in Western Pennsylvania and the

racial propensity of the jury pool, this time Plaintiff is demanding a bench trial.

**WHEREFORE**, Plaintiff respectfully moves this honorable court for leave for a new trial on all

issues.

Respectfully submitted,

/s/Zhaojin David Ke
Zhaojin David Ke
533 Indiana Drive
Erie, Pennsylvania 16505

4025 E. Roosevelt Blvd.
Philadelphia, PA 19124
814-218-6905


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was served upon the defense counsel, via the district court's ECF system, this Sept. 28, 2011.

/s/Zhaojin David Ke
Zhaojin David Ke
533 Indiana Drive
Erie, Pennsylvania 16505
4025 E. Roosevelt Blvd.
Philadelphia, PA 19124
814-218-6905