### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ZHAOJIN DAVID KE,** | ) | |
| | ) | **Civil Action No. 08-268E** |
| **Plaintiff,** | ) | |
| | ) | |
| **V.** | ) | |
| | ) | **Judge Sean J. McLaughlin** |
| **EDINBORO UNIVERSITY OF** | ) | |
| **PENNSYLVANIA, FRANK POGUE,** | ) | |
| **JANET DEAN, TERRY SMITH,** | ) | |
| **RIVA SHARPLES,** | ) | |
| | ) | |
| **Defendants.** | ) | **Electronically filed.** |

**Plaintiff's Reply Brief in Support of His Motion for Retrial**

**AND NOW**, comes Plaintiff Zhaojin David Ke to submit this reply brief in support of his motion for retrial under FRCP 59 (a)(1). Defendants' response (Doc. 115) laid out many legal standards, but they never applied nor were they able to apply those standards to the allegations Plaintiff has made in his Motion for Retrial. They never denied the specific allegations Plaintiff asserted in his Motion, making it tantamount to admitting them. To further convince the Court of his valid justifications for a retrial, Plaintiff herein lays out his argument as follows:

### I.    Statement of Facts:[1]

Plaintiff is Asian and was hired by Defendants in August 2001. He was discriminated against in work assignment from Day 1 until he left EUP in December 2007.  Overall, he was the only English faculty member in the ETA department not allowed to teach upper level/elective classes

---

[1] This is only a concise statement, leaving many back stories and numerous pieces of documented evidence out because there is no room for them. A more detailed presentation is Plaintiff's  Other Material Facts for the Court to Consider, Doc. 57-3.

just because "people were not happy teaching composition." (Ex. 1)[2] and because he was the only person of color in the ETA department.

Given Plaintiff's excellent qualifications, a BA and MA in English from China's top language institution, Shanghai Institute of Foreign Languages, an MFA from one of Canada's top universities, the Univ. of British Columbia, and a PhD from the Univ. of Illinois at Chicago, an R-1 research university, Plaintiff would never have agreed to be hired to teach composition only since that would waste his PhD training. To lure Plaintiff over to make Defendant Pogue happy—who was the first minority president of the university and who had set up an agenda to hire minorities—and yet to nevertheless intend to discriminate against Plaintiff, Smith mailed to Ke's home in Toronto, Canada an attractive job description (Pl. Ex. 6). Once Plaintiff was hired, Smith changed his position to temporary status (Doc. 57-3, Ex. 38), using his visa status as an excuse. That was a deceitful practice of "bait and switch." Plaintiff would never have applied for the job if he had known that it would be only a temporary position since he was well ensconced in a temporary position at the University of Minnesota. The truth was revealed by Sharples in her email to Ke on 9/9/05, in which she wrote:

> I was on the committee that hired you…I know that your job description says composition and upper-level writing courses, making them sound equal, but I really think **that our need at that time** -- as it continues to be -- was freshman composition and that is what we were looking for.

(Pl. Ex. 39). This proves that defendants had a motive to discriminate against Ke even at the time of his hire. Later, they insisted that Ke should obey "Student needs and institutional goals" (Ex. 2) despite Ke's argument that such needs should not apply to him alone but should apply to all English faculty. (Ex.2). From 2001 to the summer of 2006, he requested Defendants

---

[2] Plaintiff uses two sets of exhibits for this brief. The second set is based on the documents used at the trial and is marked with "Pl. Ex. #."

Smith and Sharples to let him teach upper-level classes numerous times and managed to teach only four upper-level classes through negotiations by the time he applied for tenure in Spring 2006. (Ex. 3).

In Fall 2005, Sharples created the term "Composition Faculty" in order to make Plaintiff teach only composition classes. (Ex.4). She then produced a teaching grid to let Ke rotate on only three upper-level writing classes among many colleagues. (Ex.5). This was to make sure that Ke did not get to teach an upper-level class every semester. Defendants claimed that they had too many "literature" faculty and needed to hire people to teach only composition, but Ke's co-hire, Robert Hass (Pl. Ex.6), and the two women hired a year behind him, Catherine Whitley and Mary Carden, were all literature hires (Ex. 6)—according to defendants—although their job descriptions were identical to Ke's. (Ex. 6, p.2).

When Sharples emailed Plaintiff his Spring 2007 schedule on May 11, 2006 (Pl. Ex. 46, p.3), Ke found he was the only person (except Robert Hellstrom who preferred to teach composition) in the entire department not given an upper level/elective class. (Ex.7). On the same day, he emailed Sharples to protest her continuing discrimination and called her racist for the first time. (Pl Ex. 46).

Earlier, Ke had talked to Sheehy and Sharples and Smith numerous times about course assignment, stating that he should be allowed to teach upper-level classes as there was no proof that other colleagues were not similarly situated with him. In retrospect, it was such talks and remonstrations that got Plaintiff into conflict with the chairpersons and the university. After he strongly protested the same via email on 5/11/06 (Pl. Ex. 46) and detailed Sharples' discriminatory actions in his 7/15/06 email (Ex. 8),[3] followed by his official complaint about her

_____

[3] This email was sent to all the defendants.

to the university administration on 9/8/06 (Pl. Ex. 48), which was based on Ke's 7/15/06 email,

Sharples began to retaliate.

Ke and the union asked Smith not to let Sharples write his tenure recommendation, but

Smith replied that "the Administration does not believe that is the case." (Pl. Ex. 24). While he

purposely did not do Ke's fifth-year evaluation in violation of CBA (Pl. Ex. 59;

CBA.Art.C.1.c.(3)), he also told Sharples not to do Ke's fifth-year evaluation (Ex.9) but urged

her to write Ke's tenure recommendation.

Sharples wrote a malicious recommendation (Pl. Ex. 49), lifting language from her

predecessor Donald Sheehy's hidden evaluation (Pl. Ex. 14), which was written in December

2004 after Ke had officially complained about his race discrimination in November 2004. Her

malicious tenure evaluation made a "U" turn from her previously already prejudicial

recommendation (Ex. 10) written only ten months earlier, with language already lifted from

Sheehy's hidden evaluation. Sharples concluded in her recommendation that "I cannot

recommend Dr. David Zhaojin Ke for tenure at Edinboro University" and even urged the tenured

faculty not to vote for Ke's tenure simply because "Dr. Ke desires –and **would surely demand if**

**granted tenure—to teach more than basic composition in the Department of English &**

**Theatre Arts**." (Emphasis added). (Pl. Ex. 49).

Earlier on 4/18/2006, Ke had met with Sharples in her office for about ten minutes to talk

about her promotion recommendation, with Secretary Barbara Smith sitting right outside her first

office door (her office had two doors, one opening into the department office and the other

facing the hallway). She then lied to Smith that Ke had threatened her, and Smith instantly

wanted to launch a CBA Art. 43 investigation against Ke (Pl. Ex. 21), a very serious action. Ke

was kept in the dark about all this. The ETA tenure subcommittee wrote a prejudicial tenure

recommendation as well, also lifting language from Sheehy's 12/04 hidden evaluation (Pl. Ex. 14).

Ke wrote Pogue several letters about how he was discriminated and retaliated against in the ETA department (Ex. 45), but Pogue never responded, even ignoring his request for a meeting in Sept. 2006. Sharples then further retaliated by wrongly accusing Ke of intending to use violence on her when Ke was recovering from his devastating major surgery. Sharples argued that what accounted for her fear was "[d]uring the meeting[4], Dr. Ke said that he thought [Sharples' husband] was following him around campus with a gun and that he would come 'from anywhere at any time.'" (Ex.11).

Smith anxiously intervened by providing her with a bodyguard (Ex. 11) and by warning Ke in his office, on 10/2/06 (Pl. Ex. 28), not to use violence on Sharples. Ke was so worried about his own safety that he reported to the campus police on the same day (Def's. Ex. Y).  On 10/19/06, he filed Form 283 about discrimination with EEOC, and on or about 11/5/06 he filed with EEOC a charge of retaliation. Defendants were well aware of Plaintiff's complaint made to EEOC at least from his 9/8/2006 complaint (Pl. Ex. 48), at the end of which Ke wrote:

> In fact, this time I am determined to stand up for myself, and if the circumstances do not improve in favor of diversity and employment equity, I will have no choice but to make an official complaint with the U.S. Equal Employment Opportunity Commission to get a ruling.

Even at their 9/29/2006 meeting between Ke and Sharples, Ke warned he would take the university to EEOC. (Ex.12). Sharples was aware of Ke's official complaint about her because "suddenly there were meetings and there was some unhappiness" and "[Ke] was running around to different offices, and [she] was getting called to go to meetings all the time." (Ex.13). During

---

[4] This refers to the meeting between Sharples and Ke, sponsored by Police Chief Nelson. The Statement was fabricated by Defense Counsel, not sustained by the meeting minutes written by Janet Dean (Ex. 14). The phrase "from anywhere at any time" has never been cited to any source.

the 9/29/2006 meeting, Sharples' union representative said, "Riva's reputation is being

disparaged. Charges are being made and she has no recourse." (Pl. Ex. 24).That was referring to

the 9/8/06 complaint. Smith was aware of Ke's complaint to EEOC. (Ex. 15). Janet Dean

admitted that she "notified the President that the action was filed against the University. This

defendant kept the President informed regarding the status of the EEOC complaint." (Ex. 16).

All this gave the defendants a motive to retaliate.

Around mid-October, 2006, Defendant Dean stopped Ke's fifth year evaluation in

midcourse, telling the head of the ETA evaluation committee in the human resources office (Ex.

17): "Don't do it because he's gone anyway" (Ex. 18). This means Janet Dean was involved in

Plaintiff's tenure application process in violation of CBA.Art.15.  EUP did not want a positive

evaluation to counter Ke's tenure denial since the partially done evaluation was already positive

(Pl. Ex. 3; Ex. 19)—just like his previous four years' shining evaluations (Doc. 57-3, Exs. K50

and K55) that always made EUP renew his contract year by year. Dean never investigated Ke's

race complaint and only wrote on 11/13/06 (Ex. 2) that "after a thorough review…" "there is no

racial inequality or discrimination…" This did not excuse her from *respondeat superior* though.

Then UWTC went out of its way to prejudice Ke. It first voted on Sharples'

recommendation to justify bringing in Ke for a hearing on 10/25/2006 (Pl. Ex. 50). Prior to the

hearing, Sue Norton, head of UWTC, already made up her mind not to recommend Ke for

tenure, as she told the other committee members: "I will tell you that I am not looking forward to

tonight." (Ex.20).  UWTC even planted evidence by sending a member to investigate Ke's

membership in the International Student Organization, which Ke had never joined, so that Sue

Norton could write in her recommendation that "Dr. Ke has not been active in the International

Student Organization." (Ex. 20). Then Sue Norton wantonly lied about Ke's performance at

EUP, claiming, among a dozen-plus falsehoods, that Ke's "[t]wo course proposals that were lacking in depth and specificity were turned down by the ETA Dept.," (Pl. Ex. 16), whereas Defendants denied that allegation in their Answer 40 (Doc. 8), in Sharples' Answer 8 to her interrogatories, and in Sharples' deposition.  UWTC denied Ke tenure based on Sharples' and the department tenure subcommittee's negative recommendations and on its own initiative to retaliate against Plaintiff on behalf of the administration.

Defendant Dean prepared Ke's tenure denial letter although she, as head of the human resources office and the university ombudsperson, was not supposed to get involved and submitted it to Pogue only for his signature. (Ex. 21). In fact, even Smith was shocked in his deposition that Dean had prepared the tenure denial letter only for Pogue's signature. (Ex. 22). This naturally leads to the inference that willful retaliation by defendants was a concerted effort. There was no wonder that Pogue made the tenure decision "only on the basis of what was recommended to [him] and the justification given." (Ex. 23).

For retaliation purposes, throughout the tenure application process, defendants imposed different and higher standards on Ke as a pretext to deny him tenure, as shown in Sharples' and the department tenure subcommittee's recommendation letters:

(1) Sharples falsified that Ke was not able to receive high ratings from his students for his upper-level classes (Pl. Ex. 49) although his upper-level class, Eng. 301, that he taught in Spring 2006 scored 75 on "A" on Question 21 (how much the students have learned), which was unsurpassed in the department (Ex. 24). Ke had **only one** upper-level class rated low by students

because of Sheehy's sabotage,[5] and different and higher standards were applied to Ke because probationary faculty, including Sharples herself, all had lowly rated classes (Ex.25).

(2) Sharples echoed Sheehy's hidden evaluation and falsely accused Ke of vanity/self-publishing his books (Pl. Ex. 49) although Jeffery Bartone and Thomas Lipinski, as they admitted at the trial, published absolutely nothing during their probationary years and Sharples herself published only three short articles in *The Meadville Tribune*. In fact, John Repp truly vanity-published through POD technology, admitted at trial, and Sedaris genuinely self-published during his probationary years. (Ex.26). All of them received tenure without mishap.

(3) The subcommittee quoted from Sharples' promotion recommendation and Sheehy's hidden revaluation (Pl. Ex. 14)  to indicate Ke's service was not enough although Ke's previous four years' evaluations all praised Ke for his excellent service (Pl. Exs. 17-20). The chart Ke produced at the trial showed he actually did more committee work than many of his peers, given the fact that he was not allowed to serve during his first temporary year. (Pl. Ex. 57). Every semester, he would spend a lot of time tutoring students university-wide, and he continued to tutor students even after he was denied tenure. (Pl. Exs. 61, 62; Ex. 27). Sharples tried to belittle his tutoring service and falsified that she had also signed up for volunteer tutoring and tutored no students and still received letters of commendation. (Ex. 28). However, the tutoring schedule for Spring 2006 did not show her name (Ex. 29), and she never mentioned that Pogue gave her letters of commendation in her tenure narrative.

In light of ***Roebuck v. Drexel Univ***., 852 F.2d 715, 735-36 (3d Cir. 1988), wherein Plaintiff Roebuck did not produce any smoking guns but nevertheless won his case in the Third

---

[5] Sheehy himself rated that class low out of a vendetta against Plaintiff, but after a meeting hosted by Smith he admitted he was wrong and corrected his first teaching observation. (Pl. Ex. 22).

Circuit, Ke has produced a mount of direct and circumstantial and inferential evidence even in this brief statement alone.[6] That was why EEOC, empowered by Congress to implement Title VII, made three determinations all against EUP on both his discrimination and retaliation charges. Discrimination was also due to issues of promotion and the allotment of seniority points among others, as alleged in the original complaint, and willful retaliation was further carried out in Spring 2007 by Smith through his two-week harassment of Plaintiff after Plaintiff warned a student to attend class if she did not want to fail. However, they are not included in this section so that Plaintiff does not have to produce a prolonged statement.

## II.     Discussion:

In the following, Plaintiff is going to present evidence—exhibits used at trial—to prove that Plaintiff deserves a new trial because, first and foremost, that the jury verdict was against the manifest weight of the evidence. He will next discuss how the jury abused its discretion, how the defense counsel misled the jury by altering the language of "race as a factor," and how they herded inner-circle people from the ETA department to court to perjure on the stand.[7] Although he will talk about his counsel's ineffectiveness, his purpose is to prove that if they had done what Ke discusses below the jury would have seen more of the evidence for willful retaliation. He is not going to argue that his counsel's ineffectiveness is a reason for a retrial since the Sixth Amendment right to effective assistance of counsel does not extend to civil cases.

### A.   Plaintiff deserves a new trial because the jury verdict was against the manifest weight of the evidence presented at trial

---

[6] Much more details and evidence regarding defendants' discrimination and retaliation against Plaintiff are provided in Plaintiff's Other Material Facts for the Court to Consider. See Doc. 57-3.

[7] This is already proven by Plaintiff in his Motion for Retrial.

(1) Plaintiff's counsel proved discrimination in work assignment at the trial. Pl. Ex. 6 proves that Plaintiff was hired to teach composition and upper-level writing or literature classes, but during his six and half years at EUP he was basically not allowed to teach upper level/elective classes and never allowed to teach a single literature class. Both Smith and Sharples knew he had a desire to teach upper-level classes. (Ex. 30).  Pl. Ex. 7 shows his first year's temporary contract was caused by Smith to discriminate against him. (Doc. 57-3, Ex. K 38). Pogue and Dean testified in their depositions that Plaintiff's immigration status was never an issue (Ex. 31),[8] and Dean told Norton his immigration status did not affect his tenure application. (Ex. 20).

Pl. Ex. 6 never specifies that Plaintiff was hired to teach composition only, and the employment contract he signed with Pogue in 2001 never said he was hired to teach composition exclusively. (Pl. Ex. 7). In the second year, Plaintiff made Dean correct his status and Pogue gave him a tenure track contract (Pl. Ex. 8), but even that contract did not state that he was to teach composition exclusively. Pl. Ex. 9 demonstrates that Plaintiff's first year status was complicated. Pl. Ex. 10 shows Pogue had agreed to count his first year toward his tenure-track years although his visa status had not changed at all. Pogue had said he would give Plaintiff the tenure track status only when he had gotten a green card, but Plaintiff was to wait until 2005 before he would get his permanent visa status.

Pl. Ex. 24 is about his meeting with Sharples on 9/29/06, proving Sharples used the term "Composition Faculty" to restrict Plaintiff to teaching composition. It also indicates that she even created a teaching grid (Ex. 5), in fall 2005, to restrict Plaintiff to teaching composition. Smith had never approved the grid (Ex. 32), but at the meeting he supported the grid and told Plaintiff, "David—are you saying the grid is incorrect?" Smith admitted in his deposition that he had first

_____

[8] Plaintiff was a Canadian citizen then and could legally work on any job in America (except Federal ones) thanks to the NAFTA treaty.

seen the term "Composition Faculty" only in fall 2005 (Ex. 33), although Plaintiff was hired in 2001. The meeting was about Plaintiff's 9/8/06 complaint, and Janet Dean wrote in the minutes: "Ke, I demand to be treated equally."

Pl. Ex. 26 was a teaching chart Sharples made for EEOC. The chart reiterated the concept of "Composition Faculty" and even created a brand-new category called "Writing Faculty" that included Repp and Lipinski (neither of them held a PhD). At the trial, Repp admitted that he was hired to each composition. Lipinski was genuinely hired to teach composition, as shown in the tenure list EUP made for EEOC (Pl. Ex. 69). When deposed, both Pogue and Dean admitted that in the ETA department there was no distinction between literature faculty and composition faculty (Ex. 34).

Discrimination in work assignment prevailed in Ke's employment. Pl. Ex. 27 shows Plaintiff emailed to Smith to seriously talk about course assignment for Spring 2007, but Smith never followed up with any action. In retrospect, Plaintiff always had to do deals with Defendants in order to teach an upper-level class, as indicated by Pl. Ex. 34, which shows he taught five Eng. 101 classes in Fall 02 so that Sharples could give him an upper-level class to teach in Spring 03. This Eng. 301 class would have been the first upper-level class given him, but it was removed before he could teach it and in Spring 03 he again taught only lower-level composition classes (Ex. 35). Because Sharples only considered Ke a "reserve," Pl. Ex. 36 shows his Eng. 385 could be cancelled if the other Eng. 385 could only get a few students. Pl. Ex. 39 shows emails dated 9/9/05, proving Plaintiff was once more complaining about not being allowed to teach upper-level classes. The email showed that Sharples criticized him for not willing to spend the next fifteen years teaching composition and next "promised" that she would talk to him about letting him teach literature.

Altogether Ke taught only five upper-level classes but 43 composition classes (Pl. Ex. 41) throughout his career of 6.5 years at Edinboro University, and the reason was solely because defendants wanted to maximize composition classes for him when other faculty were unwilling to teach composition classes. On 5/11/2006, Sharples emailed Ke his Spring 2007 schedule (Pl. Ex. 46, p.3; Ex. 7), and Ke found he was the only member of the English faculty not given an upper-level class. Even Bartone and Sideris who were hired to teach composition exclusively (Ex.36) were given upper-level classes in creative writing and literature.  Plaintiff seriously protested this time, and for the first time he called Sharples racist.

That was followed by his 7/15/06 email sent to all defendants (Ex.8), which was the prototype of his 9/8/06 complaint (Pl. Ex. 49). That started Sharples' retaliation with her malicious tenure recommendation that denied Ke one of the three votes for his tenure. Pl. Ex. 47 was a statement allegedly covering the 4/18/26 meeting between Ke and Sharples. Although the content was largely fabricated, the undated and unsigned narrative at least concedes that Sharples would initially allow Ke to teach literature classes but then changed her mind. Her excuse was Ke was a writing faculty member and had better not teach literature, but in her chart (Pl. Ex. 26 ) sent to EEOC she actually called him a composition faculty member while categorizing Repp and Lipinski, truly hired to teach composition, as writing faculty. (Pl. Ex. 69).

The upper-level class originally scheduled for Ke and officially published was even purposely removed (Ex.37), and that proves continuing discrimination in work assignment. Although defense counsel argued in their summary judgment motion that adverse actions beyond 300 days of Ke's EEOC complaint would not count, The Supreme Court ruled: "We hold that the statute precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period. We also hold that consideration of the entire scope of a hostile work

environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *National Railroad Passenger Corporation v. Morgan*, 536 US 101, 105 (2002). *See* also *Phillips v. Heydt*, 197 F.Supp.2d 207 (2002). *West v. Philadelphia Elec. Co*., 45 F.3d 744, 754 (3d Cir. 1995). Plaintiff complained to EEOC on 10/19/06 and 11/5/06, and the disparate treatment, especially under the 1991 Act, continued through 2007.

(2) Of Plaintiff's 68 exhibits admitted into court, the majority of them serve to prove willful retaliation.  Retaliation was broadly proven in the aspects of conspiracy, reactions to Plaintiff's protected conduct demonstrated by Sharples' tenure recommendation and her false accusation of his intention to use violence on her, and by adverse actions by all defendants and the university.  Protected conduct is shown as follows:

a. Pl. Ex. 47 is a statement, undated and unsigned, supposedly to show Plaintiff's meeting (about ten minutes) with Sharples on 4/18/2006. The narrative was largely falsified later on since the content in its specific details would have required a two-hour meeting and since on 4/18/06— still Spring 2006— Plaintiff could never have pointed out that Sideris **was teaching** an upper-level class in Fall 2006. This has a sequence flaw and is an anachronism. Anyway, Sharples did admit that Plaintiff talked to her about discrimination in course assignment. That was protected activity. The fact that she complained to Smith (Pl. Ex. 21) that Plaintiff had threatened her already proved she had started retaliating against him.

b. Pl. Ex. 48 is virtually the  paper form of 7/15/06 email sent to all defendants. (Ex. 8). In this official complaint, Plaintiff detailed Sharples' discriminatory actions against him and wrapped up his complaint by stating that if the problem of disparate treatment was not resolved

this time he would take the university to EEOC. At the 9/29/2006 meeting, Ke reiterated (Pl. Ex. 48) that if the disparate treatment was not corrected he would take the university to EEOC. Both were protected conduct. In that regard, local union head David Obringer specifically brought Plaintiff to his office and warned him that in history nobody had taken EUP to EEOC and won.

c. Pl. Ex. 27 was emailed to Smith, telling him that Plaintiff had a right to teach upper-level classes according to his original job ad. That was protected activity too. In retrospect, it was such protected activity and Ke's persistence in it that led to willful retaliation. Pl. Ex. 46 also shows Plaintiff protesting disparate treatment in course assignment. Its third page indicates that he received the Spring 2007 schedule and found he was the only faculty member (except Hellstrom who preferred to teach composition) not given an upper-level/elective class to teach. He called Sharples racist for the first time on that occasion.

d. Pl. Ex. 52 shows Plaintiff was protesting Sharples' retaliation with UWTC.  Plaintiff had received permission from Sue Norton to write this response to Sharples' malicious recommendation, but Norton then called it a "scathing letter" and accused Plaintiff in the UWTC recommendation that "his vitriolic, defamatory writing concerning other faculty members showed a lack of professionalism." (Pl. Ex. 16).

(3) Defendants could not tolerate Ke's protected conduct and started to retaliate against him with the intention to get rid of him. The retaliation was willful and vicious, as demonstrated in the following:

a. Pl. Ex. 21 shows that as soon as Sharples complained to him that Ke had called her racist and "threatened" her on 4/18/06, Smith wanted to launch a CBA. Art. 43 investigation (Pl. Ex. 23) against Ke. Smith kept Ke in the dark about all this.

b. Pl. Ex. 13 is where Plaintiff stated that he had never received a copy of Sheehy's evaluation written in December 2004 and that Smith's secretary had looked for it twice without success. Pl. Ex. 14 shows the evaluation was truly hidden because even the human resources office received it only on 5/1/06 and the president's office received it only on 5/8/06. The hidden evaluation was to become a source of false information for Sharples and the department tenure subcommittee to use for retaliation purposes. Pl. Ex. 22 proves that there was a meeting between Sheehy and Ke, and that indicated the hostility Sheehy held against Ke. Ke refused to sign the pledge of support letter for Sheehy, and that was the motive for Sheehy to retaliate, as shown in the hidden evaluation (Pl. Ex. 14) and also in another two hidden letters written in 2005. (Ex.38).

c. Pl. Ex. 33 shows the department subcommittee's prejudicial recommendation. It initially had the language of denying Plaintiff tenure, but upon objection, it removed it as it was wrong to write that before the department tenured faculty even voted. (Ex. 39). The committee's letter was retaliatory in character because it lifted language from both Sharples' recommendation and Sheehy's 12/2004 hidden evaluation. Sharples falsified that Ke showed "reluctance to get involved," and "Dr. Ke resigned from [the hiring committee] before participating" (Pl. Ex. 49), while the subcommittee echoed with "[a]lthough he mentions service on a hiring committee, he took no active role on it." Sheehy falsely wrote in his hidden evaluation that "[a]lthough elected to the Freshman Composition Committee this fall, Dr. Ke declined to serve and as a result is not serving on a department committee this year," while the subcommittee wrote that "although he was elected to the Freshman Composition Committee in 2004, he 'declined to serve.'" (Pl. Ex. 33). Finally both Sharples and the subcommittee directly quoted Sheehy's language to suggest Ke's poor service. Sheehy wrote: "1 would recommend that as he approaches the end of his probationary period, he should make every effort to allocate greater time to participating with his

colleagues in the necessary business of the department," while Sharples wrote: "A previous chair recommended that Dr. Ke "make every effort to allocate greater time to participating with his colleagues in the necessary business of the department" and the department tenure subcommittee wrote: "[H]is chair…recommends that Dr. Ke "make every effort to allocate greater time to participating with his colleagues in the necessary business of the department." The subcommittee did not quote a single sentence from the thirty-plus positive evaluations in Ke's file. (Doc. 57-3, Exs. K50 and K55). That was retaliation in broad daylight.

d. Smith did not do Ke's fifth-year evaluation in violation of CBA, Art.12, C.1.c.3., which stipulates: "The Dean shall provide a written performance review in accordance with this Article." (Pl. Ex. 59, p.4). To avoid retaliation, Ke and the union requested Smith to assign a different person to write the recommendation and told Sharples not to write his recommendation and even offered thirteen names for them to choose (Ex. 40). Smith actually knew why Plaintiff did not want Sharples to write the recommendation as he conceded in his deposition: "Just that he felt she was biased against him," (Ex.41), but he nevertheless let Sharples go ahead.

e. Pl. Ex. 59 is Art. 12 of CBA, whose C.1.a. clause stipulates:

> If necessary, or desirable, as determined by the department or President, individuals from the same or within related disciplines, mutually acceptable to the FACULTY MEMBER, department and University, who are from outside the department or the UNIVERSITIES may be used in any or all parts of the evaluation process.

Writing promotion or tenure recommendations is a form of evaluation, so the above clause applies. However, Smith, bent on retaliation, categorically refused to let a third-party write Ke's tenure recommendation and simply said that "the Administration does not believe that is the case." (Pl. Ex. 24). He argued that the chairperson was the most qualified person to write Ke's

tenure recommendation (Ex. 41) although Sharples had only been the chairperson for a year. Sharples conceded that Ke did have such a right "as specified in the Union contract." (Ex. 42).[9]

f. Pl. Ex. 24 shows Janet Dean's minutes for the 9/29/06 meeting between Ke and Sharples. The minutes indicate Sharples was well aware of the 9/8/06 complaint because she knew the meeting was about racial discrimination and because her union representative claimed at the meeting that "charges were made, and Riva had no recourse." Of course, in terms of common sense and given her sophistication, she would not have gone to a serious meeting without knowing what the meeting was about. Pl. Ex. 49 shows how Sharples retaliated in her tenure recommendation by using falsehoods. She falsified that only ten percent of Ke's upper-level classes (plural) would take his classes again, his books were self-published, and he resigned from the hiring committee before he could participate. In her deposition, however, she had admitted that it was not accurate to say that only ten percent of Ke's students wanted to take his classes again (Doc. 57-3, D5 at 68:15-17) and that Ke had not self-published. (Doc. 57-3, D5 at 60-61). Her falsehood about Ke's non-participation in the hiring committee was denied by six evaluations signed by over twenty people, including Smith and Sheehy. (Doc. 57-3, Ex. K50).

g. Pl. Ex. 15 was the first of many letters Plaintiff sent to Pogue about discrimination and retaliation in the ETA department (Ex. 43), but Pogue never responded, as he admitted at the trial. Pl. Ex. 28 shows that Smith through his secretary brought Plaintiff to his office, where he warned Plaintiff not to use violence on Sharples. That was further retaliation.

---

[9] All this has proven a conspiracy between Smith and Sharples for the purpose of retaliation. To establish conspiracy, the legal guidelines are (1) that a conspiracy has occurred to deprive a plaintiff of constitutional rights, (2) that at least one of the alleged conspirators worked to further the conspiracy, and (3) that the overt act has injured the plaintiff. *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir.1999).

h. The ETA department started evaluating Ke for the fifth year after checking with the union. Pl. Ex. 3 proves his fifth-year evaluation had started since the exhibit was part of his evaluation packet. To stop the evaluation (in violation of CBA), Janet Dean brought Ms. Blair, head of the ETA evaluation committee, to her office (Ex. 17) and told her to stop his partially completed fifth-year evaluation (Ex. 18). Defendants' purpose was to stop the department from producing an excellent evaluation to counter their tenure denial, and that was conspiracy.

g. UWTC eagerly joined the retaliation. Pl. Ex. 50 shows UWTC found Plaintiff's tenure application problematic after first voting on Sharples' malicious recommendation (Ex. 44) and ordered a hearing. Then even before the hearing, Sue Norton had already made up her mind about the results (Ex. 20). Pl. Ex. 54 is the UWTC hearing minutes, which show that Ke never said at the hearing that he was too busy with his writing to offer any service and that once he was granted tenure he would refuse to teach composition classes. These claims were made by Sue Norton in her tenure recommendation and by Defense Counsel in her summary judgment motion.

h. Pl. Ex. 16 shows that Sue Norton wrote a tenure denial recommendation, in which she fabricated numerous falsehoods to justify denying Ke tenure. Her falsifications are detailed in the "F" section below. It was obvious that her real intention was to retaliate against Ke, as actually admitted by her in her recommendation where she wrote that Ke did not "preserve and defend University goals—this last item was found to be especially problematic in the area of civility." Apparently she was referring to Ke's taking EUP to EEOC.

(4)  Defendants also carried out retaliation by applying different and higher standards to Ke's tenure application while being extremely lenient with his Caucasian colleagues. By way of example, and not of limitation, such disparate treatment is shown as follows:

a. Pl. Ex. 57 compares Ke's committee work with that of five of his colleagues during their probationary years.  The exhibit shows he was more than comparable although he was not eligible to serve in his first year. Claiming that his service was still not enough was pretextual by using different and higher standards.

b. Pl. Ex. 35 points out that although Defendants accused Plaintiff of publishing with PublishAmerica as though there were something criminal about it, Robert Weber, former provost, and Eliot Wreh–Wilson, Chair of the Dept. of Philosophy, both published with the same press without being censured. Defendants also accused Plaintiff of publishing with Pearson Custom Publishing, but the current head of the Dept. of Sociology, Ivan Chompalov, together with three of his colleagues, published with it too during his probationary years. He cited the book as his scholarship and was granted tenure without any problem. Such different standards point to willful retaliation.

c. Pl. Ex. 53 shows Ke actually published much more than any of the other probationary professors, some of them did not publish anything at all and were still granted tenure. The chair and the department tenure subcommittee both praised Bartone's and Lipinki's publications prior to joining EUP on tenure track, while they had repeatedly told Ke, who had published essays, literary short stories, and books of fiction prior to joining Edinboro University, that ONLY what he published during his probationary years would count.

d. Pl. Ex. 63 indicates that Sheehy's shining recommendation for Sharples only mentions her PhD thesis as her scholarly work. Plaintiff earned his PhD as early as 1996. Sharples published only three short articles in *The Meadville Tribune* during her probationary years and admitted in her deposition that "scholarly growth was [her] weak area" (Doc. 57-3, D5 at 63:17-18), but Plaintiff published six books and some literary short stories during his probationary

years and yet Sharples had the nerve to call his scholarship inadequate. The discrepancy flies in the face of justice.

e. Next Pl. Ex. 64 slapped Lipinski at the trial even as defense counsel denounced Ke for "selling" his textbook to his students (in reality, Plaintiff only ordered his textbook for his classes). This exhibit shows Lipinski sold his detective novel directly to his students since his publisher had given him all the unsold copies of the novel by way of paying him royalties. By the way, self-publishing was really never an issue for tenure. Sideris' only scholarship was a self-published book of African-American slang, and the department tenure subcommittee acknowledged that by writing: "**In 2005 he self-published a book of African-American slang with BookSurge** (emphasis added)," (Ex. 26), but Sideris received tenure without mishap.

f. Pl. Ex. 67 indicates that although defense counsel accused Ke of vanity-publishing to discredit his scholarship, there were people such as Bartone (Doc. 113, Ex. 16) and Repp who truly vanity-published but were never taken to task. At the trial, Repp was confronted with his vanity-publishers' language on the March Tree Press' website, which showed "a $20 reading fee," which told authors to sell their own books and order books for their classes, and which also told authors to sell their books to their friends and write fake positive comments on Amazon.com by using different names. Plaintiff's counsel invited Repp to read this last passage into the microphone.

g. Even other probationary faculty published very little during their tenure-track years, as shown in Pl. Ex. 53.

h. Defense counsel also misled the jury with the statement that Plaintiff could not teach upper-level classes well although he could teach composition classes skillfully. In fact, nobody was rated higher than Plaintiff on Item 21 when it came to teaching Eng. 301. (Ex. 24). Plaintiff

only taught four upper-level classes prior to applying for tenure (Ex.3), and of them only one was

rated low by his students because of Sheehy's sabotage. As Plaintiff testified at the trial, Sheehy

told the students, mostly English majors, to pick on Ke because he said English was only a

second language to Plaintiff and yet he had the nerve to teach American college students English.

Of course, everybody had poorly rated classes, as shown in Ex. 25, which is a chart that shows

that the worst was John Cussen. But Cussen received tenure without mishap. In fact, Ke's

teaching was affirmed even in the prejudicial department tenure subcommittee's and UWTC's

recommendations (Pl. Exs. 33, and 16). In 2/06, the year he was denied tenure, defendant Smith

thus described his teaching:

> **Extraordinary teaching effectiveness/performance of primary assignment**
> (emphasis original): Dr. Ke is a highly effective teacher, as evidenced by strong peer
> and student evaluations. His students want to take additional courses from him and
> feel they are learning a great deal in his classes. (Pl. Ex. 20).

(5) Plaintiff's counsel at trial also showed documents to prove Ke's good performance to

counter defense counsel's claim that Ke was not granted tenure because of his poor performance.

By way of example, and not of limitation, such evidence is shown as follows:

a. Pl. Ex. 3 proves Plaintiff's excellent performance in the classroom. Pl. Ex. 29 shows

his teaching quality.  Pl. Ex. 32 again demonstrates his excellent teaching quality, while Pl. Ex.

30 shows he was willing to cover other faculty's classes on a volunteer basis. Pl. Ex. 31 shows

he was willing to help lecture in somebody else's class because of his unique background.

b. Pl. Ex. 43 shows the committees Ke served on, which, when compared with other

probationary faculty in Pl. Ex. 57, proves that he did not serve less. Pl. Exs. 61 and 62 both prove

Ke's tutoring service each semester, which was very time-consuming and which was confirmed

by Pogue's letters of commendation even after he denied him tenure. (Ex. 27). Pl. Ex. 68 shows

Plaintiff was always eager to serve and told Lisa Joyce to add his name to three committees.

c. And Pl. Ex. 12 proves that Charles Marr, whom defendants claim were so unhappy about Plaintiff's service that he called him "a lazy son of a bitch" at a promotion committee's meeting, really had a very high opinion of Ke's teaching, scholarship, and service. Pl. Exs. 17-20 were Ke's four years of evaluations done by Defendant Smith, and he rated Plaintiff excellent in all teaching, scholarship, and service.

Although only selective, the above evidence presented at the trial convincingly proved Defendants' liability. It is well known that a new trial is warranted when the verdict is against the great weight of the evidence. The Supreme Court has long since recognized that a district court can grant a motion for a new trial if the verdict is against the weight of the evidence. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996); *Byrd v. Blue Ridge Rural Elec. Coop., Inc.*, 356 U.S. 525, 540 (1958); *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940).

Under the law of the Third Circuit, the mantra is always that "'[a] new trial is appropriate [] when the verdict is contrary to the great weight of the evidence or errors at trial produce a result inconsistent with substantial justice.'" *Justofin v. Metro. Life Ins. Co*., 2005 WL 758247, at *3 (E.D. Pa. Apr. 1, 2005) (quoting *Sandrow v. United States*, 832 F. Supp. 918, 918 (E.D. Pa. 1993)). In the Third Circuit itself, new "trials because the verdict is against the weight of the evidence are proper [] when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 309 n.18 (3d Cir. 2007) (citing *Williamson v. Consol. Rail Corp*., 926 F.2d 1344, 1353 (3d Cir.1991)).

The district court has discretion to grant a new trial when the jury verdict is against the weight of the evidence. In that regard, the Third Circuit also states that "considerable deference remains due to [a district court's] determination that a verdict is against the weight of the

evidence. The trial judge observes 'the witnesses and follows the trial in a way that [the Third

Circuit] cannot replicate by reviewing a cold record." *Williamson*, 926 F.2d at 1353 (quoting

*Roebuck v. Drexel Univ.*, 852 F.2d 715 (3d Cir. 1988)). In our case, the Court understands the

case perfectly well regardless of the trial. After all, the Court has handled the case for over three

years and has even issued a judgment on defendants' summary judgment motion.

In fact, in granting a motion for a retrial, the Court has broad discretionary power, and

more importantly, "[u]nlike a sufficiency of the evidence claim, when a court evaluates a

challenge to the weight of the evidence it does not view the evidence in the light most favorable

to the verdict winner, but instead exercises its own judgment in assessing the evidence." *Marra*,

497 F.3d at 309 n.18 (citing *Greenleaf v. Garlock, Inc*., 174 F.3d 352, 365 (3d Cir.1999)).

### B. The jury abused its discretion

(1) This Court charges the jury with: "[I]t is your duty, ladies and gentlemen, to follow

these instructions. In doing so, you must take into consideration all of the instructions I give

you…" The Court also charges the jury with: "[Y]ou must accept the rules of law as I give them

to you and apply those rules to the facts of the case."

However, the jury did not follow the instructions given. Plaintiff has no idea how the

jurors decided, but obviously they ignored the jury instructions. For one thing, if they had trouble

deciding on racially based discrimination and retaliation, they at least should not have had any

difficulty proving Title VII retaliation, which could even be independent of the race factor. With

respect to that, the Court unequivocally instructs:

> To prevail on this claim, Plaintiff must prove all of the following by a
> preponderance of the evidence. First, that Plaintiff alleged Defendant Sharples
> discriminated against him on the basis of his race. Second, that Plaintiff was
> subjected to a materially adverse action at the time, or after, the protected conduct
> took place. Third, there was a causal connection between the Plaintiff's denial of

tenure and Plaintiff's allegation that Defendant Sharples discriminated against him on the basis of his race.

Concerning the first element, Plaintiff need not prove the merits of his allegation, but only that he was acting under a good faith belief that Plaintiff's right to be free from discrimination on the basis of race was violated.

Concerning the second element, the term "materially adverse" means that Plaintiff must show that the denial of tenure was serious enough that it well might have discouraged a reasonable worker from complaining.

Concerning the third element, that of causal connection, that connection may be shown in many ways. For example, you may or may not find that there is sufficient connection through timing, that is, the denial of tenure followed shortly after Edinboro University became aware of Plaintiff's allegation. Causation is not, however, necessarily ruled out by a more extended passage of time. Causation may or may not be proven by antagonism shown toward Plaintiff or a change in demeanor toward him.

Ultimately, you must decide whether Plaintiff's allegation had a determinative effect on the tenure decision. "Determinative effect" means that if not for the allegation Plaintiff made against Defendant Sharples, the denial of tenure would not have occurred.

A simpler version of this instruction is available in the Court's summary judgment order wherein the Court succinctly stated:

> With respect to the retaliation claim. In order for a plaintiff to establish a prima facie case of retaliation under Title VII, the plaintiff must show: (1) protected employment activity; (2) adverse action by the employer either after or contemporaneous with the protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. ***Woodson v. Scott Paper Co***., 9 109 F.3d 913, 920 (3rd Cir. 1997).

Doc. 71. Applying the above to the direct evidence produced at the trial, Plaintiff's counsel proved the retaliation claim with a distinct timeline.  Plaintiff complained about discrimination in course assignment and that led to his official complaint of Sheehy in Nov., 2004, which led Sheehy to write a negative classroom observation and the negative hidden evaluation[10] after writing five shining evaluations. (Ex. 45). Plaintiff continued to protest disparate treatment in work assignment, as conceded in Sharples' 4/18/06 statement. (Pl. Ex. 47). On 5/11/06, Sharples emailed Ke

---

[10] In fact, Sheehy was determined to retaliate against Ke. He wrote altogether three hidden letters until he was denounced by Smith (Pl. Ex. 14; Ex. 38).

the schedule for Spring 2007 and Ke protested and called her racist. (Pl. Ex. 46). On

7/15/06, Ke emailed her and the other defendants her discriminatory actions. Then

Plaintiff officially complained about Sharples on 9/8/06. All of them were protected

conduct under Title VII and the First Amendment. Then Sharples retaliated by writing a

vicious tenure recommendation for Ke against his vehement objection (Pl. Ex. 49) and

lifted language from Sheehy (Pl. Ex. 49) for that purpose. The department tenure

subcommittee, under the leadership of Sharples, also retaliated and lifted language from

both Sharples and Sheehy. (Pl. Ex. 33).

In his 9/8/06 complaint and also in his 9/29/06 meeting, Ke told the university that if the

issue of disparate treatment was not resolved he would complain to EEOC. That planted the seed

of retaliation for the defendants. Then on 10/19/06 and 11/5/06, he actually did. That further

gave the defendants a motive for retaliation. Sharples and the department tenure subcommittee

both wrote negative tenure recommendations for Plaintiff, whose tenure ballots in the ETA

department were **only counted by one person,** William Hunter**,** who was against Ke's tenure

(Ex. 46), and Janet Dean then stopped his fifth year evaluation in midcourse in mid-October

because she had decided he was already a goner (Ex.18). Pogue ignored Ke's letters about

discrimination and retaliation, conceded at the trial, and the UWTC retaliated by writing a false

tenure recommendation (Pl. Ex. 16). Janet Dean then prepared the tenure denial letter only for

Pogue's signature (Ex. 21), and finally Pogue readily signed the letter because he only relied on

recommendations (Ex. 23).  This demonstrates a picture of concerted efforts to railroad Plaintiff

out of EUP. Strategically, all of them used different and higher standards as a pretext to justify

why Ke was denied tenure as though the termination had absolutely nothing to do with

retaliation.

These last two paragraphs summarize the protected activities and adverse actions, and the temporal proximity is adequate to show a causal nexus unmistakably leading to the conclusion of willful retaliation. All this was presented by Plaintiff's counsel to the jury with convincing exhibits of documented evidence. The jurors should have known that the law does not require them to have direct evidence such as an admission or a direct statement to prove retaliation. Instead, the evidence only needs to be adequate to **support an inference** that the individuals at issue were aware of the protected conduct. The jury instructions given by the Court itself clearly spelled out that an employer's intention could be inferred from circumstantial proof. With respect to that, the evidence provided at the trial was more than sufficient to support such an inference, but the jury nevertheless chose not to apply the law given in the jury instructions to the evidence and therefore abused its power.

The jury could have thought that retaliation could only be proven when Plaintiff proved that he was retaliated against just because he was Chinese, as repeatedly stated to them by the defense counsel at trial, unaware that Title VII retaliation could have been established even if they did not believe there was racial discrimination in Western Pennsylvania. Therefore, the jury abused its discretion.

(2) The jury also abused its power by not deliberating the case properly.  According to Oxford Dictionary, the word "deliberate," when used as a verb, means to "engage in long and careful consideration."[11] But the jury's deliberation lasted only about half an hour. The court was adjourned at 12:30 on 9/13/11. The jurors went to the jury room to have lunch provided by the court before they started their deliberations. The 19 pages of the jury instructions alone would have taken them more than thirty minutes to go through, and there were many legal terms

---

[11] The source is at http://oxforddictionaries.com/definition/deliberate?region=us.

contained therein. The jurors were provided with 68 admitted exhibits from Plaintiff alone, and perusing even a dozen of them would take an hour or so.

Apparently, they did not read the jury instructions on their own and reached the decisions too soon in contradistinction to the instruction that "[their] verdict should be reached only after careful and thorough deliberations," as stipulated in the jury instructions. Plaintiff was in the middle of his lunch when Attorney Timothy McNair called to say that the jury had reached a verdict. It was only 1:49 in the afternoon.  Their deliberations simply ended far too quickly for them to have fairly weighed the case, and therefore their verdict prejudiced Plaintiff and virtually guaranteed a miscarriage of justice.

This discussion with the supporting exhibits from the trial undoubtedly indicates that the jury misbehaved and simply did not live up to the expectations trusted to them by the judicial system. That violated Plaintiff's right to a fair, impartial jury. In federal courts, jury misconduct calls for new trials, and this is sustained by a rich body of case law.  *Spencer v. Georgia*, 500 U.S. 960, 114 L. Ed.2d 727, 111 S. Ct. 2276 (1991); *Williams v. Price*, 238 F.3d 1111 (9th Cir. 2001) ; *United States v. Rouse*, 100 F.3d 560 (8th Cir. 1996)*; Jimenez v. Heyliger*, 792 F.Supp. 910 (D. Puerto Rico 1992); *Tobias v. Smith*, 468 F. Supp. 1287 (W.D.N.Y. 1979); *United States v. Resko*, 3 F.3d 684 (3rd Cir. 1993); *United States v. Humphrey*, 208 F.3d 1190 (10th Cir. 2000); *Oswald v. Bertrand*, 374 F.3d 475 (7th Cir. 2004)**; *United States v. Resko***,3 F.3d 684 (3rd Cir. 1993); *Dickson v. Sullivan*, 849 F.2d 403 (9 Cir. 1988).

## C.  Defense counsel's calculated, inflammatory misconduct prejudiced Plaintiff before the jury

At the trial, particularly in the opening and closing speeches, Defense counsel calculatingly changed the concept of "race as a factor" to "because he is Chinese" to inflammatorily influence the jury.  Semantically, the phrase "race as a factor" never equals

"because he is Chinese." While the abstract term "race" is only a factor, not the reason itself, the word "Chinese" in "because he is Chinese," with its specific, definitive definition, virtually became the reason itself.

In a legal sense, it is undisputed that the two expressions have drastically different definitions and connotations. While "race as a factor" means that race plays a role, major or minor, in discrimination and retaliation, the clause "because he is Chinese," which defense counsel repeated many times from the opening speech to direct and cross-examinations to the closing speech, completely mischaracterized Plaintiff's case because then the implied meaning to the jury was solely that Ke was denied tenure **because he was Chinese**, not because of discrimination and retaliation.

Given the economic reality, the word "Chinese" could have whipped up, in the jurors' minds, anti-Chinese sentiments to psychologically prejudice the Plaintiff. While the word "race" is a neutral noun, the word "Chinese" has loaded meaning in the current circumstances in America and tends to bring up a host of negative connotations particularly in Western Pennsylvania where the overwhelming population is conservative. Among the residents of Western Pennsylvania, the word "Chinese" could well have conjured up these concepts: (1) China is America's forthcoming enemy; (2) China is America's factory; (3) China manipulates currency; (4) China means Communism and dictatorship; (5) China takes away American jobs; and (6) China abuses human rights. By repeating the clause "because he is Chinese," defense counsel "repeatedly, deliberately and impermissibly played to the perceived anti-Chinese prejudice of the jurors, thereby irrevocably tainting the verdict." ***Wicklund v. Pacific Cycle, L.L.C.***, No. 08-CV-486-GKF-FHM, Document 72, 2010 WL 3368924 (N.D. Okla. August 23, 2010).

Legally, to ask if Plaintiff was denied tenure because of a race factor is drastically different from the question if Plaintiff was denied tenure **because he was Chinese**. The latter was intentional misinterpretation and meant to inflame, arouse, and mislead the jury to make them prejudice Plaintiff.  That was clearly misrepresentation and misconduct on the part of the defense counsel, and that alone warrants a new trial because but for the misconduct the jury might have determined differently and treated the case more fairly. A new trial is properly granted where a party can: "(1) prove by clear and convincing evidence that the verdict was obtained through fraud, misrepresentation, or other misconduct [and] (2) establish that the conduct complained of prevented the losing party from fully and fairly presenting his case or defense." *Jones v. Aero/Chem Corp*., 921 F.2d 875, 79 (9th Cir.1990).

Asking the jury if Plaintiff was denied tenure because he was Chinese was like asking the jury to find direct evidence such as a direct statement to prove the link between his tenure denial and his being Chinese, which was not there. The jury could mistakenly have believed that the Plaintiff must prove discriminatory intent by direct evidence. That could have caused confusion among the jury and made them quickly decide that there was no such a smoking gun and therefore they should find for the defendants.

 "Quoting Weinstein, we have stated that evidence is unfairly prejudicial if it 'appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish,' or otherwise 'may cause a jury to base its decision on something other than the established propositions in the case.'" *Carter v. Hewitt*, *617 F.2d 961,* 972 (3d Cir.1980).

Plaintiff has proven both prongs of *Jones* in this discussion to deserve a new trial. The inflammatory language that "he was denied tenure because he is Chinese" "was capable of confusing and thereby misleading the jury." *Link v. Mercedes-Benz of North Am. Inc*., 788 F.2d

918, 922 (3d Cir.1986). Plaintiff's  new trial motion should be granted if misconduct of the opposing counsel prevented the jury from fairly considering the full extent of his case. See ***Jones*** at 878.

The Third Circuit Court does review 'District Court decisions whether to grant a new trial because of alleged attorney misconduct for abuse of discretion. See ***Blanche Road Corp. v. Bensalem Township***, 57 F.3d 253, 264 (3d Cir.1995);  ***Fineman v. Armstrong World Indus. Inc.***, 980 F.2d 171, 207 (3d Cir.1992); ***Garland Coal & Mining Co. v. Few***, 267 F.2d 785, 792 (10th Cir. 1959), but such review should first be accomplished by the district court because "'[i]n matters of trial procedure, the trial judge is entrusted with wide discretion because he [or she] is in a far better position than we to appraise the effect of the improper argument of counsel.' " ***Fineman***, 980 F.2d at 207 (quoting ***Reed v. Philadelphia Bethlehem & New England R.R. Co***., 939 F.2d 128, 133 (3d Cir.1991)).

### D. Defense counsel staged collective perjured testimony to mislead the jury

(1) Defendants brought seven witnesses from the ETA department to perjure on the stand. The witnesses all lied strategically to influence the jury since their testimony was considered direct evidence according to the jury instructions. The witnesses' lies were all exposed in Plaintiff's Motion for Retrial at ¶19. Their testimony was irreverent and immaterial to Plaintiff's discrimination and retaliation case and was orchestrated solely for the purpose of influencing the jury.

The witnesses all lied under oath. Lisa Joyce looked very innocent on the stand, but she falsified that she had no knowledge of Plaintiff serving on the elections committee. See Plaintiff's Motion for Retrial, ¶19, d, for the findings. She also falsified on the stand that she had attended numerous conferences and always used her own money and that the university would at

best only furnish her with a couple of hundred dollars each time, but the attached exhibit (Ex. 47), submitted to EEOC by Edinboro University, proved that she was not telling the truth. Attending conferences was often considered as having holiday trips by many faculty—a privilege Plaintiff could never enjoy as the chairperson kept telling him to wait until he received tenure.

   (2) Falsifying testimony started with Defendants when they filed the summary judgment motion. Defense counsel somehow falsified Lipinski's and Hunter's verifications without signing or dating the affidavits. Apparently Defense counsel also partially falsified Sue Norton's affidavit. Plaintiff explained the falsification in his responses to their statements. See Doc. 58. The false testimony, this time done by all seven witnesses, tremendously harmed Plaintiff's case at trial since the testimony could have been pivotal to turn the jury against Plaintiff.

   The fact that the witnesses perjured, *en mass,* under oath was deplorable. The Court should never tolerate it and ought to sanction such behavior. By collective perjury, the witnesses turned the trial into a farce in willful contempt of the Court. The false testimony was organized and coached because each of the witnesses used the same pattern, that is, first boasting of their own achievements based on their self-inflated CV's and then denouncing plaintiff's scholarship and service. In that regard, there was even a division of labor among the witnesses, as detailed in Motion for Retrial, Doc. 113. Here Plaintiff would like to add that Lipinski, already proven a liar in Doc. 113, also lied on the stand that he had nominated Ke to the promotions committee but Ke refused to serve on it. Lipinski was Sheehy's attack dog—literally—and Sheehy hated Ke for not supporting him in EUP's investigation of his gender discrimination against women faculty in 2003. Lipinski hated Ke equally and was even Sharples' bodyguard against Ke in Fall 2006. He

would never ever have nominated Ke to the promotions committee since it was such a powerful committee and since Ke himself was applying for promotion in 2003 and 2005.

The collective perjury was purely for the purpose of misleading the jury against Plaintiff. A new trial is required if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . ." ***Napue v. Illinois***, 360 U. S. 271 (1959). False testimony is not admissible, but unfortunately defendants' witnesses already prejudiced Plaintiff at trial.

Further, perjured testimony violates due process. Defendants' misconduct in herding witnesses to court to perjure denied Plaintiff an opportunity to present his case fairly to the jury. The ruling of perjured testimony as grounds for a new trial is followed by many courts.  A new trial should be granted where an improper statement "made it 'reasonably probable' that the verdict was influenced by prejudicial statements. ***Draper v. Airco Inc.,*** *580* F.2d 91, 97 (3d Cir. 1978); ***Fineman*** at 207; ***United States v. Washington***, 184 F.3d 653, 658 (7th Cir. 1999) ("In considering the weight of the evidence, the court must necessarily consider the credibility of the witnesses."). "Applying the new trial standard set out in ***McQueeny v. Wilmingtoo Trust Co***., 779 F.2d 916, 928 (3d Cir.1985), the district court held that the erroneous admission of this testimony necessitated a new trial because it was 'quite possible' that Westinghouse's 'substantial rights' had been affected." ***Bhaya v. Westinghouse Elec. Corp.,*** 922 F. 2d 184, 187 (3rd Cir. 1990).

### E. There were unresolved evidentiary disputes that negatively impacted Plaintiff's meritorious case so far as the trial was concerned

(1) The fact that Plaintiff was not allowed to mention his EEOC complaints prejudiced him since the defendants retaliated against Plaintiff not only because of his complaint about Sharples but also because of their knowledge that Plaintiff had stated he would take EUP to

EEOC (Pl. Ex. 48) and then actually did on 10/19/06 (Doc.113, Ex. 3) while his tenure application was being reviewed.

(2) Although Plaintiff's counsel tried to prove discrimination in work assignment with Pl. Exs. 6, 7, 8, 9, 10, 24, 26, 27, 34, 36, 39, 41, 46, and 47, the jury instructions did not instruct the jury to rule on the charge of discrimination. If such instructions had been given, the jury would have connected the dots between Ke's numerous complaints about work-assignment discrimination and the retaliation to prevent making retaliation an isolated issue based only on his complaint about Sharples and on his being Chinese. In other words, disparate treatment, added by Congress to the 1991 Act to amend the Civil Rights Act of 1964, ought to have been given room in the jury instructions. This argument would have been made easier if Defendants had provided Plaintiff's former colleagues' job ads to prove they were all similarly situated with him.  Defendant Pogue admitted in his deposition that the former job ads were available in the human recourses office or in individual department offices. (Ex.48).  By the way, job description really did not matter. According to former colleague Ro Blair's deposition, people were hired to teach composition, but after a couple of years they all started teaching their own specialties. (Ex.49). That explains why Jeffery Bartone, hired to teach composition exclusively (Ex. 36), has mostly taught only upper level/elective classes over the past four years (Ex. 50).

(3) It was true the Court ruled on Plaintiff's discrimination charge in its summary judgment order, but it only dismissed the hostile environment charge because the Court believed the charges were not serious enough to form a hostile environment, but the order did not dismiss the charge of discrimination in work assignment.

(4) Plaintiff's former attorney did not make an argument about Plaintiff's protected filing date with EEOC earlier on. As a result, defense counsel took advantage of it and used the date on

EEOC's charge form as his filing date, which was contradicted by EEOC's own activity log (Doc. 113, Ex. 2). That had a devastating impact on Plaintiff's retaliation claims against EUP and the individual defendants because the part of retaliation predicated on Plaintiff's filing with EEOC was suppressed, considerably weakening Plaintiff's retaliation claim. Therefore, Plaintiff's 10/19/06 filing date ought to be kept and Plaintiff be allowed to use that in his trial although the Court may maintain its order that Plaintiff be forbidden to talk about the three determinations at the trial. That would have established another important basis for retaliation regardless of EEOC's rulings.

The aforementioned four arguments all point to the incorrectness in the handling of evidence for the trial as a result of unresolved evidentiary disputes between Plaintiff and Defendants. That, in light of **McQueeny v. Wilmington Trust Co**., 779 F.2d at 928, made Plaintiff well deserve a new trial unless it was highly probable that the error did not affect any of his "substantial rights." *See also* FRCP 61.  However, in our case when the basis of the motion for a new trial is an alleged error involving a matter within the discretion of the trial court, such as the court's evidentiary rulings or jury instructions, the trial court should use its wide discretion to rule on Plaintiff's motion for a new trial. **Wagner v. Fair Acres Geriatric Ctr**., 49 F.3d 1002, 1017 (3d Cir. 1995).

**F. There were issues about the ineffective assistance of Plaintiff's counsel**

(1) As stated earlier, Plaintiff is presenting this argument not as a reason to justify a retrial, but to prove that but for his counsel's ineffective assistance the jury would have seen more evidence of the retaliation and also how the witnesses perjured on the stand. Relative to this, first, Plaintiff's counsel erred by not examining, on the stand, Sue Norton, head of UWTC and a key figure, to prove defendants' retaliation. Sue Norton sat in the gallery for days, and if

she had been called to testify at the trial, Plaintiff's counsel could, through her, have presented to the jury the following:

a. UWTC, headed by Sue Norton, retaliated against Plaintiff. It started its work by voting on Sharples' malicious letter (Ex.44, ¶3) and concluded that Ke's tenure application was problematic and that a hearing was in order for October 25, 2006. (Pl. Ex. 50).

b. Norton emailed Ke a list of questions, starting with one about his immigration status, irrelevant to his tenure application but was racial profiling. (Pl. Ex. 50).

c. Norton did not ask Plaintiff to provide her with his fifth-year evaluations but asked for other trivial missing documents. (Pl. Ex. 50). That was troubling because the fifth-year evaluations would be way more important.

d. The hearing was merely a formality. Norton emailed the UWTC members on the morning of the hearing that "I will tell you that I am not looking forward to tonight." (Ex. 20).

e. Norton sent a committee member to talk to the International Student Organization and then declared that Ke had misrepresented in his tenure narrative. (Ex. 20). Plaintiff had never claimed he had been involved with that organization. He helped Asian students in his office, as acknowledged in numerous performance evaluations. (Doc. 57-3, Exs. K50 and K55).

f.  She stated that Ke's tenure application packet was "incomplete and disorganized, containing some outdated and redundant materials." (Pl. 16, ¶2), whereas it had been tampered with by the administration. (Ex. 51).

g. Norton falsified that Plaintiff had served "on one department committee only," belied even by Sharples' and the department's prejudicial recommendations.

h. About Ke's course proposals, Norton falsified, "Two course proposals that were lacking in depth and specificity were turned down by the ETA Dept." (Pl.Ex.16, p.2, ¶3). The falsehood was exposed by Answer 40 (Doc. 8) and Sharples' deposition.

i. Norton falsified that Plaintiff did not have "attendance at professional organizations" (Pl.Ex.16, p.2, ¶3), despite the department tenure subcommittee's acknowledgment that "over the last two summers, he has been awarded coveted writer-in-residence positions at Anderson Arts Center in Minnesota and New Pacific Studio in California." (Pl.Ex.33).

j. Norton also falsified that there was no testimony of experts in the discipline for Ke (Pl.Ex.16, p.2, ¶3). Plaintiff included a dozen or so academic references in his tenure application binder to testify to his accomplishment in his discipline.

k. She lied that Plaintiff had no membership in professional organizations (Pl.Ex.16, p.2, ¶3). The department tenure subcommittee wrote in its recommendation that "he is a participating member of PEN, the international organization of poets, essayists, and novelists." (Pl. Ex. 33). Ke was also a member of the Association of Pennsylvania State College and University Faculties and paid his dues for 6.5 years.

l. Norton falsified that Plaintiff did not show "evidence of current activity which maintains or increases subject mastery" (Pl.Ex.16, p.2, ¶3), but the tenure subcommittee stated: "He is editing a new collection of short fiction."(Pl.Ex.33).

m. Norton falsified that Ke had said during the tenure hearing that he was too busy with his writing to serve on committees (Pl.Ex.16, p.2, ¶5), but the falsehood was not reflected in the hearing minutes. (Pl. Ex. 54).

n. Norton falsified that Plaintiff had never attended library services committee meetings (Pl.Ex.16, p.2, ¶5), but evidence proved otherwise (Ex. 52).

o. Norton said that Ke did not satisfy the "Professional Responsibilities" section because he did not "preserve and defend University goals" (Pl.Ex.16, p.1, bottom ¶3).  She could have meant that Ke had taken the university to EEOC, but CBA does not have that requirement for tenure.

Norton's recommendation on behalf of UWTC was exactly the materials Pogue needed to justify denying Ke tenure because he depended "only on the basis of what was recommended to [him] and the justification given." (Ex. 26). Plaintiff's counsel ought to have shown all this to the jury, but he did not.

(2) The second error Plaintiff's counsel made was not to cross-examine the majority of the seven witnesses after they falsely testified. He only cross-examined Repp, Lipinski,  and Bartone with prepared questions. He should have cross-examined Lisa Joyce, Robert Hass, John Cussen, Jeffery Bartone (and Lipinski for their falsehoods about Ke's committee work), and Catherine Whitley. Exposing witnesses' falsehoods would have destroyed their credibility in the eye of the jury and helped Plaintiff get a fairer treatment from it.  He should have questioned Bartone if he had really appointed Ke to the composition committee or if he had merely lifted the information from Sheehy's hidden evaluation of 2/2004. The fact that Plaintiff's counsel did not cross-examine the witnesses to impeach their credibility showed his ineffectiveness and harmed the case he represented.

**G. Given the reasons shown above, the Court should grant Plaintiff's motion for a retrial.**

Of all the reasons, the most important is the first reason: Plaintiff deserves a new trial because the jury verdict is against the manifest weight of the evidence presented at trial and cries out to be overturned. The grant of the motion is well justified under Rule 59 (a)(1), which allows

the Court to grant a new trial "for any of the reasons for which new trials have heretofore been granted."

In general, a motion for a new trial can be granted when the district court—in its own assessment of the evidence presented—believes that the verdict went against the manifest weight. *Cefalu v. Vill. of Elk Grove*, 211 F.3d 416, 424 (7th Cir. 2000). So far as this is concerned, the district court is in the best position to evaluate the evidence and determine whether the verdict is against the weight. In the case at bar, the Court has handled it for three years and passed a summary judgment on it. The Court saw the evidence presented at the trial and heard defense counsel repeat the question if Dr. Ke was denied tenure because he was Chinese. The court also heard the witnesses testify. Therefore it has a good handle of the circumstances surrounding the case. If, after evaluating the evidence, the Court is of the opinion that the verdict is indeed against the great weight of the evidence, a new trial is appropriate. *King v. Harrington*, 447 F.3d 531, 534 (7th Cir. 2006).

Besides, the district court has broad sweeping discretionary power to decide on a new trial once it applies the correct law. See *Wagner v. Fair Acres Geriatric Ctr*., 49 F.3d 1002, 1017 (3d Cir. 1995) (decision relative to the grant of a new trial lies entirely with the sound discretion of the trial court). See also *Aldridge v. Forest River, Inc.*, 635 F. 3d 870 (7th Cir. 2011). "The trial judge in the federal system has powers [] to comment on the weight of evidence and credibility of witnesses, and discretion to grant a new trial if the verdict appears to him to be against the weight of the evidence." *Byrd v. Blue Ridge Rural Elec. Coop., Inc*. at 540. The Supreme Court stated that 'lt]he authority to grant a new trial ... is confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chemical Corp. v. Daiflon, Inc*., *449 U.S. 33,* 36, 101 S.Ct. 188, 191 (1980). *Waldorf v. Shuta*, *896F.2d 723,* 737 (3d Cir.1990);

*Honeywell v. American Standards Testing Bureau*, *851 F.2d 652,* 655 (3d Cir.1988), cert. denied, 488 U.S. 1010, 109 S.Ct. 795, 102 L.Ed.2d 787 (1989); *link v. Mercedes-Benz of North America, Inc*., *788F.2d* 918,921-22 (3dCir.1986); *Silverii v. Kramer*, *314F.2d 407,* 413 (3d Cir. 1963).

### III. Conclusion:

FRCP 59 (a)(1) allows a trial court to grant a new trial based on its assessment of the fairness of the trial and the reliability of the jury verdict. "A new trial may be granted…if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co*., 773 F. 2d 610, 613 (5th Cir. 1985). Plaintiff's case is meritorious, so the jury verdict and defense counsel's misconduct truly shocked his conscience and defendants' witnesses' perjury *en mass* seriously astounded his psyche. As a result, Plaintiff finds it absolutely necessary for the verdict to be overturned to avoid a miscarriage of justice.

For the foregoing reasons, a new trial as a matter of law is justified and Plaintiff respectfully moves this Honorable Court to grant his motion under FRCP 59 (a)(1) and to provide him with the opportunity for a bench trial on all issues so triable.

Respectfully submitted,

/s/Zhaojin David Ke
Zhaojin David Ke
533 Indiana Drive
Erie, Pennsylvania 16505
4025 E. Roosevelt Blvd.
Philadelphia, PA 19124
814-218-6905

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was
served upon the defense counsel, via the district court's ECF system, this Nov. 29, 2011.

/s/Zhaojin David Ke
Zhaojin David Ke
533 Indiana Drive
Erie, Pennsylvania 16505
4025 E. Roosevelt Blvd.
Philadelphia, PA 19124
814-218-6905