IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| ZHAOJIN DAVID KE, | ) |  |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 08-268 Erie |
| EDINBORO UNIVERSITY OF PENNSYLVANIA, FRANK POGUE, JANET DEAN, TERRY SMITH, and RIVA SHARPLES, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., District Judge

Pending before the Court is a motion for a new trial filed by the Plaintiff pursuant to Federal Rule of Civil Procedure 59(a)(1)(A). ECF No. 113. For the reasons that follow, that motion will be denied.

**I.  PROCEDURAL HISTORY**

Edinboro University of Pennsylvania ("University") is a member of Pennsylvania's State System of Higher Education ("System"). 24 PA. STAT. § 20-2002-A(a)(6). Dr. Frank Pogue ("Pogue") served as the University's President from July 1, 1996, through June 30, 2007. ECF Nos. 45 & 60 at ¶ 6. During the relevant period of time, Dr. Terry Smith ("Smith") served as the Dean of the University's School of Liberal Arts, Dr. Riva Sharples ("Sharples") served as the Chairperson of the Department of English and Theatre Arts ("Department"), and Janet Dean ("Dean") served as the Associate Vice-President for Human Resources and Faculty Relations. ECF Nos. 45 & 60 at ¶¶ 4-6, 65. Plaintiff Zhaojin David Ke ("Ke"), a native of China, was employed as an Assistant Professor in the Department from August 2001 through December 2007. *Id.* at ¶ 1.

Ke filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 11, 2007, alleging that the University had unlawfully discriminated against him because of his Asian race. ECF No. 43-12 at 43. He stated that he had been subjected to discrimination between August 1, 2001, and December 18, 2006. *Id.* Ke maintained that, during

1

the course of his employment, he had been "subjected to unequal terms and conditions," "assigned to teach only lower level courses," and denied opportunities for promotion and tenure. *Id.* He alleged that he had spoken to University personnel on September 8, 2006, about racial discrimination perpetrated by Sharples, and that Sharples had retaliated against him by writing a "malicious letter" expressing opposition to his application for tenure. *Id.* On January 24, 2007, the University received written notice of Ke's EEOC charge. *Id.* at 46.

Ke filed a second charge of discrimination with the EEOC on February 6, 2007. *Id.* at 49-50. In that charge, Ke stated that he had informed University officials on September 8, 2006, that he would be voicing complaints about discrimination to the EEOC. *Id.* at 49. He asserted that, in a letter dated December 18, 2006, the University had informed him that his employment contract would not be renewed. *Id.* Ke alleged that the University's action had been taken in retaliation for his earlier complaints. *Id.*

Efforts to conciliate the matter ultimately proved to be unsuccessful. On July 1, 2008, Ke was provided with written notice of his right to sue the University for violating his rights under Title VII of the Civil Rights Act of 1964 ("Title VII") [42 U.S.C. § 2000e *et seq.*]. Ke commenced this action against the University, Pogue, Smith, Sharples and Dean on September 26, 2008, alleging violations of Title VII, the Fourteenth Amendment to the United States Constitution, the Pennsylvania Human Relations Act ("PHRA") [43 PA. STAT. § 951 *et seq.*], and Article I, § 26, of the Pennsylvania Constitution. ECF No. 1 at ¶¶ 111-120. Ke's Fourteenth Amendment claims were grounded in the Equal Protection Clause and brought pursuant to 42 U.S.C. § 1983. *Id.* at ¶ 112. His Title VII and PHRA claims were based on allegations that University officials had subjected him to various forms of discrimination and retaliation. *Id.* at ¶¶ 16-110. He also averred that his work environment had been sufficiently "hostile" and "racist" to be actionable under Title VII and the PHRA. *Id.* at ¶¶ 84-100.

The Defendants moved for summary judgment on July 20, 2010. ECF No. 43. On December 14, 2010, the motion for summary judgment was granted in part and denied in part. ECF No. 71 at 20. Some of Ke's Title VII claims were deemed to be time-barred. *Id.* at 14. It was determined that his "hostile work environment" claims were devoid of evidentiary support. *Id.* at 19-20. The PHRA claims against the University (and the individual defendants in their official capacities) were dismissed on the ground that they were barred by the Eleventh

Amendment to the United States Constitution.[1]  *Id.* at 20.  The Defendants' motion for summary judgment was denied in all other respects.  *Id.* at 16-18, 20.  The Court concluded that genuine issues of material fact existed as to whether the Defendants had discriminated against Ke on the basis of his race in denying him tenure or retaliated against him by denying him tenure based on his complaints of racial discrimination.  *Id*. at 16-18.  Consequently, Ke's Title VII claims against the University,[2] as well as his constitutional claims against the individual Defendants under § 1983,[3] were permitted to proceed.[4]  *Id.* 16-18, 20.

A jury was empaneled on September 6, 2011.  ECF No. 104.  The jury rendered verdicts in favor of all Defendants on September 13, 2011, concluding that no Defendant had discriminated against Ke on the basis of his race and that the University had not retaliated against him for engaging in protected activity.  ECF No. 110.  On September 28, 2011, Ke, proceeding *pro se*, filed the instant motion for a new trial.[5]  ECF No. 113.  Our jurisdiction is based on 28 U.S.C. § 1331.

## II.    TRIAL RECORD

Dr. Donald Sheehy ("Sheehy") served as the Department's Chairman immediately before Sharples.  Trial Tr., Day 1, p. 58.  During the summer of 2003, some of the Department's professors circulated a petition seeking Sheehy's removal.  Trial Tr., Day 1, pp. 57-58.  The professors supporting the petition drive believed that Sheehy had been unfair to female members of the faculty.  Trial Tr., Day 2, pp. 103-104, 118.  Some of the Department's other professors circulated a competing petition expressing support for Sheehy's retention.  Trial Tr., Day 2, p. 170.  Neither petition was signed by Ke.  Trial Tr., Day 1, p. 58; Trial Tr., Day 2, pp. 119, 170.  Although Dr. Catherine Whitley ("Whitley") asked Ke to sign the petition expressing confidence in Sheehy's leadership ability, he declined to do so.  Trial Tr., Day 2, p. 170.

---

[1] Congress has validly abrogated the States' Eleventh Amendment immunity in actions arising under Title VII. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 452-457, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976).  For this reason, Ke's Title VII claims against the University were not barred by the Eleventh Amendment.
[2] Individuals cannot be held liable under Title VII.  *Dici v. Commonwealth of Pennsylvania*, 91 F.3d 542, 552 (3d Cir. 1996).
[3] Ke's constitutional claims proceeded only against the individual defendants because a State is not a "person" amenable to suit under § 1983.  *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 60-71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).
[4] At trial, Plaintiff did not pursue the claims based on the Pennsylvania Constitution or the PHRA.
[5] Ke was represented by counsel at trial.  However, subsequent to trial, the Court granted their motion to withdraw as counsel.  ECF No. 112.

During the Fall 2004 semester, Ke became engaged in a dispute with Sheehy about the content of his courses. Trial Tr., Day 2, pp. 171-173. On November 19, 2004, Ke filed a complaint with Dean concerning Sheehy's conduct. Trial Tr., Day 1, pp. 59, 111. In the complaint, Ke accused Sheehy of racism. ECF No. 43-10 at 52-62. The complaint was apparently filed because Ke believed that, as a consequence of his Chinese background, Sheehy did not want him teaching Americans who were majoring in English. Trial Tr., Day 2, pp. 171-172. Ke partially attributed Sheehy's alleged animus to the fact that he had refused to sign the petition favoring Sheehy's retention as the Chairman. Trial Tr., Day 2, pp. 170-173. In a performance evaluation prepared in December 2004, Sheehy noted that Ke was not serving on any departmental committees. ECF No. 55-4 at 36-37. Despite this deficiency, Sheehy recommended that Ke's teaching contract be renewed for the 2005/2006 academic year. *Id.* at 37.

Sharples became the Chairperson of the Department on March 22, 2005. Trial Tr., Day 2, p. 77. She had previously served as Sheehy's Deputy Chairperson. Trial Tr., Day, 2, p. 186. The University's investigation into Ke's allegations against Sheehy uncovered no evidence of race discrimination. Pogue notified Ke of the results of the investigation in a letter dated June 1, 2005. Trial Tr., Day 2, pp. 185-186; ECF No. 56-2 at 46. Ke testified that he had been dissatisfied with the results of the investigation, but that he had decided not to push the matter "too hard." Trial Tr., Day 2, p. 186.

During the spring of 2005, Ke underwent surgical treatment for a medical condition. Trial Tr., Day 3, p. 8. While on leave, Ke applied for a promotion to the position of Associate Professor. Trial Tr., Day 2, p. 83. In a letter to the University-Wide Promotions Committee ("UWPC") dated November 29, 2005, Sharples stated that Ke had satisfied the "minimum requirements" for the promotion. Trial Tr., Day, 3, p. 72; ECF No. 43-11 at 12. Nevertheless, she opined that Ke's contributions in the area of "departmental and university service" had been "minimal," and that his colleagues wanted him to show more participation in that area. Trial Tr., Day 3, pp. 72-73; Trial Tr., Day 4, p. 171. Ke did not receive the promotion. Trial Tr., Day 1, pp. 83, 91.

The Association of Pennsylvania State College and University Professors ("APSCUF") served as the union for the professors teaching throughout the System's institutions. Under the collective bargaining agreement applicable to the University's professors, probationary members

4

of the faculty were permitted to apply for tenure after teaching for five academic years. Trial Tr., Day 1, p. 97. The sixth year was a terminal year for any professor who chose not to apply for tenure, or whose application for tenure was denied. ECF No. 43-11 at 41. The tenure application process was governed by Article 15 of the collective bargaining agreement. ECF No. 56-2 at 34. Pursuant to Article 15, tenured faculty members within an applicant's department were required to make a recommendation to the University-Wide Tenure Committee ("UWTC") as to whether he or she should be awarded tenure. ECF No. 43-1 at 30-31. The departmental chairperson was also required to make a recommendation to the UWTC concerning a professor's application for tenure. *Id.* After reviewing both recommendations, the UWTC was charged with the duty of making a final recommendation to the President of the University. *Id.* at 31. The discretion to grant or deny an applicant's request for tenure was entrusted to the President. *Id.*

In a letter dated January 30, 2006, Pogue informed Ke that he had until May 1, 2006, to apply for tenure. ECF No. 43-11 at 14. Ke responded by submitting his application. ECF No. 43-11 at 43-57. At some point, he became aware of Sharples' letter regarding his application for the position of Associate Professor. Viewing the letter as detrimental to his prospects for advancement, Ke requested a meeting with Sharples. Trial Tr., Day 3, p. 70. Ke and Sharples met on April 18, 2006, to discuss the matter. Trial Tr., Day 4, p. 56. The meeting was not cordial. Ke threatened to complain to University officials if Sharples did not agree to recommend him for tenure. Trial Tr., Day 4, p. 147. This encounter occurred as Sharples was preparing to begin a three-week maternity leave. Trial Tr., Day 4, p. 147.

With respect to the April 18, 2006 meeting, Sharples explained that Ke had been upset about the tone of the letter that she had written in support of his promotion application. Trial Tr., Day 4, pp. 145-148. When questioned about her encounter with Ke, Sharples testified that he had threatened to "make [her] life miserable" by doing the same thing to her that he had done to Sheehy. Trial Tr., Day 4, p. 147. She stated that she had understood Ke's threat to be an attempt to "blackmail" her into supporting his application for tenure. Trial Tr., Day 4, p. 147. Professor John Repp ("Repp") testified that Sharples had met with him and Professor Thomas Lipinski ("Lipinski") shortly after her April 18, 2006, encounter with Ke, and that she had asked them to escort her to and from her classes. Trial Tr., Day 5, pp. 12-13.

On May 10, 2006, Ke complained about Sharples' conduct in a letter to Pogue. Trial Tr., Day 3, pp. 90-91; ECF No. 56-2 at 22-23. In an email sent to Sharples on May 11, 2006, Ke

5

accused her of being a racist and threatened to report her alleged misconduct to the University's administration. Trial Tr., Day, 3, p. 103-105. After returning from her maternity leave, Sharples informed Smith of her interactions with Ke. Trial Tr., Day 4, p. 147. Sharples testified that she had submitted a written statement to Smith concerning the meeting of April 18, 2006, upon her return from maternity leave, but that she had not considered her submission of the statement to constitute the filing of a formal complaint against Ke. Trial Tr., Day 4, pp. 147-148, 172-174. Smith responded to Sharples' complaint by lodging a formal complaint about the matter with Dean. Trial Tr., Day 4, p. 174.

In an email sent to Smith on May 21, 2006, Ke asked that Sharples be disqualified from making a recommendation concerning his application for tenure. Trial Tr., Day 2, pp. 62-63; Trial Tr., Day 3, p. 120; ECF No. 43-11 at 27. He justified his request on the basis that Sharples' letter of November 29, 2005, had been "prejudicial" to his efforts to secure a promotion. Trial Tr., Day 2, p. 63; ECF No. 43-11 at 27. The request was denied. Trial Tr., Day 2, pp. 63-64, 72; Trial Tr., Day 4, p. 151. Although a great deal of tension existed between Ke and Sharples during the fall of 2006, Smith testified that the terms of the collective bargaining agreement had foreclosed the option of having someone other than Sharples evaluate Ke's application for tenure. Trial Tr., Day 2, pp. 68-69, 72. He acknowledged that Sharples had "felt threatened" by Ke. Trial Tr., Day 5, p. 21.

Smith denied that he had discriminated against Ke because of his Asian race, or in retaliation for his complaints against Sheehy and Sharples. Trial Tr., Day 5, p. 8. Indeed, Smith testified that he had played no role in the decision to deny Ke's application for tenure. Trial Tr., Day 5, p. 7. He explained that under the collective bargaining agreement, Deans had no involvement in the procedures governing the awarding or denial of tenure. Trial Tr., Day 5, pp. 7-8.

In a memorandum to Dean dated September 8, 2006, Ke accused Sharples of "systematic" race discrimination. ECF No. 43-11 at 30-32. He stated that Sharples had deliberately obstructed the development of his career by denying him opportunities to teach upper-level courses. *Id.* at 30. Ke alleged that Sharples' letter of November 29, 2005, had been "driven by racial animus." *Id.* Calling Sharples "a racist by her innate nature," Ke described other incidents in which she had allegedly subjected him to unfavorable treatment. *Id.* at 32. He

6

threatened to take the matter to the EEOC "if the circumstances d[id] not improve in favor of diversity and employment equity." ECF No. 54-2 at 25.

The departmental committee[6] met on September 14, 2006, to consider Ke's application for tenure. The eighteen members of the committee deadlocked, by a vote of 9-9, as to whether Ke should be granted tenure. Trial Tr., Day 2, pp. 11, 37, 121, 127. They forwarded Ke's application to the UWTC for further consideration. ECF No. 43-12 at 4.

As a tenured member of the Department's faculty, Dr. Caroline Nobile ("Nobile") served on the departmental committee when Ke's application for tenure was being considered. Trial Tr., Day 1, p. 83. She testified that some members of the committee had opposed Ke's request for tenure out of a belief that he had overstated his scholarly accomplishments by relying on self-published literary works. Trial Tr., Day 1, pp. 85-86. Nobile ultimately voted in favor of recommending Ke for tenure. Trial Tr., Day 1, p. 88.

Dr. Janet Kinch ("Kinch"), another member of the departmental committee, testified that she had also cast her vote in support of Ke's application. Trial Tr., Day 2, p. 92. When asked about the fairness of the evaluation process, Kinch opined that Ke had been held to a higher standard than other professors who had applied for tenure. Trial Tr., Day 2, pp. 96-97. She stated that tenure had previously been granted to professors who had never published literary works. Trial Tr., Day 2, p. 84. Kinch described Ke as an "extremely prolific" writer. Trial Tr., Day 2, p. 84.

The members of the departmental committee typically voted on an anonymous basis. Trial Tr., Day 5, p. 31. Dr. Elisabeth Joyce ("Joyce"), a member of the committee, did not reveal how she had voted in connection with Ke's application for tenure. Trial Tr., Day 5, pp. 30-31. Nevertheless, she testified that she had not cast her vote on the basis of a racial or retaliatory animus. Trial Tr., Day 5, p. 31. Lipinski, Cussen and Repp also testified that their votes had not been influenced by Ke's Asian race, or by the complaints that he had lodged against Sheehy and Sharples. Trial Tr., Day 5, pp. 17, 50-51, 64. Repp revealed that he had voted against recommending Ke for tenure because Ke had not effectively distinguished his self-published publications from his peer-reviewed publications. Trial Tr., Day 5, pp. 16-17.

---

[6] The Court uses the term "departmental committee" to refer to the group consisting of all tenured members of the Department's faculty. Trial Tr., Day 2, p. 115.

7

An applicant for tenure at the University is generally evaluated in the areas of teaching, scholarship and service. Trial Tr., Day 4, p. 154. In a letter to the UWTC dated September 29, 2006, Sharples stated that she could not recommend Ke for tenure because of his deficiencies in the areas of scholarship and service. ECF No. 43-12 at 14-16. Beneath her signature, Sharples stated that Ke had declined an offer to review and discuss the contents of the letter. *Id.* at 16. One of the deficiencies referenced in the letter concerned Ke's reliance on several "self-published publications" in the area of scholarship. Trial Tr., Day 4, p. 132. Such "publications" were deemed to be less prestigious than "peer-reviewed publications." ECF No. 43-12 at 15. Another deficiency highlighted by Sharples centered on Ke's alleged reluctance to serve on University and departmental committees. Trial Tr., Day 4, pp. 177-178.

Sharples testified that she had not recommended Ke for tenure because of the deficiencies discussed in her letter. Trial Tr., Day 4, pp. 152, 154. She denied that she had acted on the basis of a discriminatory animus grounded in Ke's Asian race, or on the basis of a retaliatory animus stemming from his allegations against her and Sheehy. Trial Tr., Day 4, p. 152. She asserted that her training as a journalist had enabled her to "divorce" her emotions from her judgment. Trial Tr., Day 4, p. 155. Sharples further testified that she had expressed a desire to let someone else evaluate Ke's application for tenure, but that APSCUF personnel had advised her that she needed to conduct the evaluation herself. Trial Tr., Day 4, p. 151.

Dr. John Cussen ("Cussen") and Dr. Jeffrey Bartone ("Bartone") both testified that Ke had resigned from the Department's Freshman Composition Committee after attending only one meeting. Trial Tr., Day 5, pp. 64, 71. Whitley stated that Ke had attended only one meeting of the University-Wide Library Service Committee. Trial Tr., Day 5, p. 78. Professor Robert Hass ("Hass") testified that Ke had only participated in the business of the Department's Election Committee on one occasion. Trial Tr., Day 5, p. 38. Lipinski described an instance in which Ke had declined a nomination to serve on an unspecified committee. Trial Tr., Day 5, pp. 45-46.

The UWTC met on October 12, 2006, to consider tenure applications submitted by Ke and two other professors. The six members of the UWTC unanimously voted to recommend the other two professors for tenure. ECF No. 43-12 at 29. Discussion of Ke's application was tabled because of perceived deficiencies in his application packet. *Id.* Sue Norton ("Norton"), the Chairperson of the UWTC, emailed Ke on October 13, 2006, and invited him to appear before the UWTC on the evening of October 25, 2006. *Id.* at 30. In her message, Norton informed Ke

8

that he should be prepared to discuss his "immigration status" and "missing" evaluations that had been submitted by his peers and students. *Id.*; Trial Tr., Day 3, pp. 150-152. That same day, Ke received and read a copy of Sharples' letter of September 29, 2006. ECF No. 43-12 at 18. On October 15, 2006, Ke provided the UWTC with a written response to Sharples' letter. Trial Tr., Day 3, pp. 153-154. In his response, Ke described Sharples as a "hysterically furious racist." Trial Tr., Day 4, p. 54. He stated that her letter was "full of misrepresentations and lies." ECF No. 43-12 at 18. Ke further explained that he had previously objected to Sharples' participation in the recommendation process. *Id.*

Pursuant to Norton's offer, Ke agreed to appear before the UWTC on October 25, 2006. Trial Tr., Day 4, p. 20. Prior to the meeting, Dean informed Norton that Ke's immigration status had no bearing on whether he should be awarded tenure. Trial Tr. Day 3, p. 151; ECF No. 56-4 at 5. Ke was advised that he would not have to provide the UWTC with information pertaining to his immigration status. Trial Tr., Day 3, p. 151. After the meeting was called to order, Ke provided the UWTC with the peer and student evaluations that Norton had requested. ECF No. 56-4 at 5. He also answered questions about his tutoring of students and service on educational committees. Trial Tr., Day 4, pp. 20-25. Professor Rosemarie Blair ("Blair") appeared on Ke's behalf and spoke in support of his application for tenure. Trial Tr., Day 2, p. 128-129. She testified that the members of the UWTC had repeatedly interrupted her during the meeting, and that she had not been provided with an adequate opportunity to explain why she believed that Ke should be awarded tenure. Trial Tr., Day 2, pp. 128-129. Blair expressed the view that several of the Department's professors had singled Ke out for disfavored treatment in retaliation for his refusal to sign the petition expressing support for Sheehy's retention. Trial Tr., Day 2, pp. 118-119.

The UWTC convened on October 31, 2006, to finalize its decision as to whether Ke should be recommended for tenure. ECF No. 43-12 at 32. All six members of the UWTC voted to recommend that Ke's application for tenure be denied. Trial Tr., Day 1, pp. 116-117. The UWTC's unanimous recommendation was communicated to Pogue in a letter from Norton dated November 1, 2006. ECF No. 43-12 at 33-34. In her letter, Norton stated that Ke's "vitriolic, defamatory writing concerning other faculty members" had shown "a lack of professionalism." Trial Tr., Day 1, p. 117.

9

On November 13, 2006, Dean provided Ke with a written response to his allegations against Sharples. ECF No. 43-11 at 39. In her letter, Dean stated that she and Smith had investigated Sharples' actions in relation to the letters concerning Ke's applications for promotion and tenure, and that no evidence of "racial inequality or discrimination" had been found. *Id.*

Pogue testified that he had heard rumors about Sharples' safety concerns during the fall of 2006. Trial Tr., Day 1, p. 115. He acknowledged that those concerns had played a role in his ultimate decision denying Ke's application for tenure. Trial Tr., Day 1, p. 116. Pogue stated that his decision had been primarily based on the fact that neither the departmental committee nor the UWTC had recommended Ke for tenure. Trial Tr., Day 2, pp. 8-9, 11, 14-15. He testified that he could not even remember reading Sharples' letter of September 29, 2006. Trial Tr., Day 2, pp. 8, 13. Pogue denied that he had rejected Ke's application for tenure because of his Asian race. Trial Tr., Day 2, pp. 4, 7-8. In a letter dated December 18, 2006, Pogue informed Ke that his employment contract with the University would expire after the conclusion of the Fall 2007 semester. ECF No. 43-11 at 41.

### III. STANDARD OF REVIEW

The determination as to whether a new trial should be granted "is left to the sound discretion of the trial court." *Zarow-Smith v. New Jersey Transit Rail Operations, Inc.*, 953 F.Supp. 581, 585 (D.N.J. 1997). Although a court enjoys wide latitude in determining whether to grant a new trial "when the reason for interfering with the jury verdict is a ruling on a matter that initially rested within the discretion of the court," a new trial should be granted on the ground that the verdict is against the weight of the evidence only when a decision to leave the verdict undisturbed would result in a miscarriage of justice. *Klein v. Hollings*, 992 F.2d 1285, 1289-1290 (3d Cir. 1993). A new trial may not be granted merely "because the evidence was sharply in conflict, because the jury could have drawn different inferences or conclusions, or because another result [would have been] more reasonable." *Shushereba v. R.B. Industries, Inc.*, 104 F.R.D. 524, 527 (W.D.Pa. 1985). It is impermissible for a trial court to "substitute its 'judgment of the facts and the credibility of the witnesses for that of the jury.'" *Fineman v. Armstrong World Industries, Inc.*, 980 F.2d 171, 211 (3d Cir. 1992), quoting *Lind v. Schenley Industries, Inc.*, 278 F.2d 79, 90 (3d Cir. 1960)(*en banc*).

10

## IV. DISCUSSION

Ke primarily argues that the verdicts rendered by the jury were "against the manifest weight of the evidence presented at trial." ECF No. 117 at 9. As previously discussed, he can obtain a new trial on that basis only by showing that a failure to set aside the verdicts would result in a miscarriage of justice. *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1352 (3d Cir. 1991).

### A. RACE DISCRIMINATION

A public employer violates the Equal Protection Clause when it intentionally discriminates against an employee because of his or her race. *Bradley v. Pittsburgh Board of Education*, 913 F.2d 1064, 1079 (3d Cir. 1990). An aggrieved public employee can proceed under § 1983 against the individuals responsible for perpetrating such discrimination. *Hargrave v. County of Atlantic*, 262 F.Supp.2d 393, 439-442 (D.N.J. 2003). Title VII's anti-discrimination provision declares it to be an "unlawful employment practice" for a covered employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). It is beyond dispute that Title VII applies to a covered university's decision to grant or deny a professor's application for tenure. *Bennun v. Rutgers State University*, 941 F.2d 154, 173-180 (3d Cir. 1991).

The evidence at trial was more than sufficient to support the jury's finding that Ke's application for tenure had not been denied because of his race. In her letter recommending the denial of Ke's application, Sharples referred to his alleged deficiencies in the areas of scholarship and service. ECF No. 43-12 at 14-16. At trial, these alleged deficiencies were described in detail by Sharples, Repp, Cussen, Bartone, Whitley, Hass and Lipinski. Trial Tr., Day 4, pp. 132, 152, 154, 177-178; Trial Tr., Day 5, pp. 16-17, 38, 45-46, 64, 71, 78. The jury was entitled to conclude that Ke's own shortcomings, rather than a racial animus, had motivated Sharples' decision to recommend a denial of the application. Trial Tr., Day 4, pp. 152-155.

Smith testified that he had played no direct role in the consideration or denial of Ke's application for tenure. Trial Tr., Day 5, pp. 7-8. On May 21, 2006, Ke asked Smith to designate someone other than Sharples to prepare the "recommendation letter" required to complete his application packet. Trial Tr., Day 2, p. 63. When asked about the matter, Smith testified that he

11

had been unable to honor Ke's request because, under the express terms of the collective bargaining agreement, the letter had to come from Sharples. Trial Tr., Day 2, pp. 63-69. This testimony provided the jury with a reasonable basis for concluding that Smith had not denied Ke's request on the basis of a racial animus.

On September 14, 2006, the eighteen tenured members of the Department's faculty deadlocked, by a vote of 9-9, as to whether Ke should be recommended for tenure. Trial Tr., Day 2, pp. 11, 37, 121, 127. In her letter of September 29, 2006, Sharples stated that she could not provide Ke with a positive recommendation. ECF No. 43-12 at 16. During their meeting on October 31, 2006, the six members of the UWTC unanimously voted against recommending Ke for tenure. Trial Tr., Day 1, pp. 116-117. Ke's application was presented to Pogue in this posture.

Pogue testified that he had denied the application because neither the departmental committee nor the UWTC had provided Ke with a positive recommendation. Trial Tr., Day 2, pp. 8-11. He stated that Sharples' letter had not been a significant factor in his decision. Trial Tr., Day 2, p. 13. In fact, Pogue asserted that he could not remember whether he had read the letter before deciding to deny the application. Trial Tr., Day 2, pp. 8, 13. It was well within the province of the jury to credit Pogue's testimony that he denied Ke's tenure application for race-neutral reasons. In addition, Joyce, Lipinski, Cussen and Repp all testified that their votes in connection with Ke's application had not been influenced by his race. Trial Tr., Day 5, pp. 17, 31, 50-51, 64. The jury was entitled to credit the testimony of those witnesses as well.

In sum, we find no basis to disturb the jury's verdict that neither the individual Defendants nor the University discriminated against Ke on the basis of his race in denying him tenure.

  **B.**  **RETALIATION**

Ke contended at trial that the University had retaliated against him by denying him tenure because he had voiced complaints that he had been discriminated against on the basis of his race. Title VII's anti-retaliation provision makes it unlawful for a covered employer "to discriminate against any of his [or her] employees or applicants for employment" "because he [or she] has opposed any practice made an unlawful employment practice" by Title VII, "or because he [or she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a). In order to establish a

violation of this statute, a plaintiff must show that: (1) he or she engaged in conduct entitled to statutory protection; (2) the defendant took a "materially adverse" action (or a series of "materially adverse" actions) against him or her; and (3) there was a causal connection between his or her statutorily-protected conduct and the defendant's "materially adverse" action (or series of "materially adverse" actions). *Estate of Oliva v. Dept. of Law & Public Safety*, 604 F.3d 788, 798 (3d Cir. 2010). In order for an employee's "opposition" to unlawful discrimination to enjoy statutory protection, the employee must act on the basis of an objectively reasonable belief that the "opposed" conduct actually violates Title VII. *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006).

There was ample evidence from which the jury could have concluded that Ke had not engaged in conduct that was entitled to statutory protection or, if he did, there was not a causal connection between that conduct and his denial of tenure. The jury heard testimony concerning the complaints of racial discrimination that Ke had lodged against Sheehy. Trial Tr., Day 1, pp. 59, 111; Trial Tr., Day 2, 171-173. Ke testified that he had agreed to stop complaining about discrimination in return for Sheehy's removal. Trial Tr., Day 2, p. 185. When questioned about her encounter with Ke on April 18, 2006, Sharples testified that Ke had tried to "blackmail" her into providing him with a positive recommendation by threatening to accuse her of discrimination if she did otherwise. Trial Tr., Day 4, pp. 145-148. Sharples accused Ke of stating, "I'm going to do to you what I did to Don Sheehy." Trial Tr., Day 4, p. 147. After the meeting, Ke accused Sharples of discrimination and asked that someone else be selected to evaluate his qualifications for tenure. Trial Tr., Day 2, pp. 62-63; Trial Tr., Day 3, p. 120. He reported Sharples' alleged misconduct to Dean on September 8, 2006. ECF No. 43-11 at 30-32. In his memorandum to Dean, Ke described Sharples as "a racist by her innate nature." *Id.* at 32.

Ke's complaints about Sharples' alleged "racism" were protected under Title VII only if he reasonably believed, "in good faith," that her conduct in relation to him was actually violative of the anti-discrimination provision. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996). An employee who knowingly makes false allegations of discrimination enjoys no statutory protection from retaliation. *Gilooly v. Missouri Dept. of Health & Senior Services*, 421 F.3d 734, 740 (8th Cir. 2005). Furthermore, the anti-retaliation provision "does not immunize an employee from the consequences of his or her defamatory statements simply because those statements are made in the context of an abstract complaint about discrimination."

13

*Hubbell v. World Kitchen, LLC*, 688 F.Supp.2d 401, 442 (W.D.Pa. 2010). In light of Sharples' testimony describing Ke's alleged threat to accuse her of race discrimination if she did not support his efforts to obtain tenure, the jury was entitled to conclude that Ke's allegations against Sharples had not been made in good faith, and that they had been made solely for the purpose of "blackmailing" or pressuring her into providing him with a positive recommendation. Trial Tr., Day 4, pp. 145-148.

In her letter of November 29, 2005, Sharples stated that Ke's contributions in the area of "university and departmental service" had been "minimal." Trial Tr., Day 3, pp. 72-73; Trial Tr., Day 4, p. 171. That letter is what prompted Ke to voice complaints against Sharples and seek her exclusion from the tenure-review process. Trial Tr., Day 2, pp. 62-63; Trial Tr., Day 3, p. 120. The fact that Ke's alleged deficiencies were referenced by Sharples *before* the "protected conduct" at issue undermines his contention that a causal relationship existed between that conduct and the statements contained in Sharples' letter of September 29, 2006. Sharples testified that her husband had encouraged her to provide Ke with a positive recommendation in order to blunt his hostility. Trial Tr., Day 4, p. 151. She stated that she would have recommended Ke for tenure if she could have done so on the basis of the applicable criteria. Trial Tr., Day 4, p. 152. Sharples was not required to set aside her objectivity and accede to Ke's demands simply because he had accused her of race discrimination. Title VII's anti-retaliation provision did not provide Ke with a license to place Sharples in "a judicial straight-jacket not contemplated by Congress." *Curay-Cramer v. Ursuline Academy of Wilmington, Delaware, Inc.*, 450 F.3d 130, 137 (3d Cir. 2006). Based on the testimony given at trial, the jury could have reasonably concluded that there had been no causal relationship between Ke's "protected activity" and the statements contained in Sharples' second letter.

Ke provided the UWTC with a written response to Sharples' letter on October 15, 2006. Trial Tr., Day 3, pp. 153-154. In his response, Ke called Sharples a "hysterically furious racist." Trial Tr., Day 4, p. 54. The six members of the UWTC unanimously voted against recommending Ke for tenure. Trial Tr., Day 1, pp. 116-117. In her letter communicating the UWTC's recommendation to Pogue, Norton stated that Ke's "vitriolic, defamatory writing concerning other faculty members" had demonstrated "a lack of professionalism" on his part. Trial Tr., Day 1, p. 117. Norton's letter also highlighted some of Ke's alleged deficiencies in the areas of scholarship and service to the University. ECF No. 43-12 at 39-40.

14

Dean and Smith investigated Ke's allegations against Sharples. ECF No. 43-11 at 39. The investigation uncovered no evidence of "racial inequality or discrimination." *Id.* Pogue testified that he had accepted the UWTC's recommendation, despite its partial reliance on Ke's alleged "defamation" of Sharples, because the investigation had failed to substantiate Ke's allegations. Trial Tr., Day 2, p. 12. In order to establish a violation of the anti-retaliation provision, however, Ke needed to prove that his statutorily-protected activity had been a *determinative* factor in the University's decision to deny his application for tenure. *LeBoon v. Lancaster Jewish Community Center Association*, 503 F.3d 217, 232, n. 8 (3d Cir. 2007). The departmental committee's 9-9 vote concerning Ke's application preceded the UWTC's recommendation by six weeks. Trial Tr., Day 2, pp. 11, 37, 121, 127. Ke's alleged shortcomings in the areas of scholarship and service were described at trial by Sharples, Repp, Cussen, Bartone, Whitley, Hass and Lipinski. Trial Tr., Day 4, pp. 132, 152, 154, 177-178; Trial Tr., Day 5, pp. 16-17, 38, 45-46, 64, 71, 78. Assuming *arguendo* that Ke's "vitriolic, defamatory" statements about Sharples were protected under Title VII, the testimonial record contained ample evidence of Ke's alleged deficiencies to support a finding that his application would have been rejected even if he had not made those statements. *LeBoon*, 503 F.3d at 232, n. 8.

## V. CONCLUSION

For the foregoing reasons, Ke's motion for a new trial will be denied. An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ZHAOJIN DAVID KE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 08-268 Erie |
| ) | |
| EDINBORO UNIVERSITY OF ) | |
| PENNSYLVANIA, FRANK POGUE, ) | |
| JANET DEAN, TERRY SMITH, and ) | |
| RIVA SHARPLES, ) | |
| ) | |
| Defendants. ) | |

## ORDER

AND NOW, this 15th day of August, 2012, for the reasons set forth in the accompanying memorandum opinion, IT IS HEREBY ORDERED that the Plaintiff's Motion for a New Trial [ECF No. 113] is **DENIED**.

                                            s/ Sean J. McLaughlin
                                            United States District Judge

cc:    All parties of record